**Salem**

STEDSON ADEKE LINKOUS, JR.

v.

SUSAN KINGERY, et al.

No. 1560-88-3

Decided March 20, 1990

COUNSEL

Stedson A. Linkous pro se; Kenneth J. Lasky (Malcolm M. Doubles, Bird, Kinder & Huffman, on brief), guardian *ad litem*, for appellant.

John L. Cooley (Mark J. Peake, Fox, Wooten & Hart, P.C., on brief), for appellee.

OPINION

**KOONTZ, C.J.** —In this appeal, the issue is whether the trial court correctly held, pursuant to Code § 63.1-225(D),[1] that consent to adoption by a stepfather was withheld by the natural father contrary to the best interests of the children sought to be adopted.

Kenneth Wayne Kingery filed a petition in the Circuit Court for the City of Roanoke seeking the adoption of John Michael Linkous, age nine, and Matthew Benjamin Linkous, age seven. His wife and the children's mother, Susan Kidd Kingery, joined in the petition to indicate her consent. Stedson A. Linkous, Jr., the children's natural father, by proper pleading, filed his objection. Subsequently, the court entered an order of reference directing the local Department of Social Services to conduct an investigation of the matter and furnish a report to the court and counsel. Because Mr. Linkous was incarcerated in the Virginia penitentiary, the court appointed a guardian *ad litem* to defend his interest in these proceedings. A guardian *ad litem* was also appointed to represent the interests of the children. Upon the filing of the appropriate pleadings and the completion and filing of the report

---

[1] Code § 63.1-225(D) was previously designated as Code § 63.1-225(c) until the 1989 revisions to Code § 63.1-225. Those revisions are not pertinent to this appeal.

by the Department of Social Services, the court held an *ore tenus* hearing on the petition. All parties, including the natural father, were present.

While in conflict in many regards, the evidence adduced at the hearing may be fairly summarized as follows. Stedson Linkous and Susan Kingery were married in 1968. Three children were born of this marriage, including John Michael, born June 21, 1978, and Matthew Benjamin, born August 21, 1980. Stedson A. Linkous, III, born September 26, 1969, was an adult at the time of the proceedings in question and was not a party to the adoption petition. The couple separated in October, 1981, following an argument during which, according to Mrs. Kingery, Mr. Linkous threatened her and several members of her family. Mrs. Kingery obtained an uncontested final divorce on November 8, 1982. The final decree granted her custody of the children and granted Mr. Linkous reasonable visitation rights. For several years prior to the final separation, there were frequent arguments between the couple and Mr. Linkous was frequently away from the home for extended and unexplained periods of time. There was no evidence of physical abuse of the children by Mr. Linkous.

In 1983, Mr. Linkous was convicted of armed robbery and malicious wounding and sentenced to serve a term of thirty-two years in the penitentiary. Following his incarceration, he was convicted of conspiracy to distribute marijuana to another inmate and was sentenced to serve an additional ten year term. At the time of the hearing in the trial court, Mr. Linkous' first eligibility parole date was 1992.

From the time of the separation in 1981, Mr. Linkous had minimal contact with John and Matthew. Following his incarceration in 1983, the children visited with their father on only one occasion. Thereafter, Mr. Linkous and several members of his family encouraged the mother to continue visitation and offered to provide transportation for this purpose, but Mrs. Kingery declined. Moreover, Mrs. Kingery has declined to tell the children that Mr. Linkous remains incarcerated. She maintains that they have no recollection of their visit with their father at the penitentiary.

Mrs. Kingery received public assistance from January 1982 until her marriage to Mr. Kingery on October 10, 1987. During this period she did not report to the welfare agency the receipt of

money from Mr. Linkous, which was paid to her through members of his family. During his incarceration Mr. Linkous has sent the children gifts, cards, and small amounts of money. In addition, prior to her remarriage, various members of Mr. Linkous' family provided financial assistance and food to Mrs. Kingery for the benefit of the children. Mr. Linkous and these same family members testified to Mr. Linkous' love for his children and his desire to be reunited with them upon his release from incarceration.

Constance A. Gorsuch, a social worker with the local Department of Social Services, prepared the report for the court and testified at the *ore tenus* hearing. In essence, she testified that the Kingery marriage was stable and Mr. Kingery was a capable parental figure. Ms. Gorsuch, based on her interview with the children, was of the opinion that they accepted Mr. Kingery as their father figure. She further testified that the children "don't seem to have any feelings toward [Mr. Linkous]. They don't know him." Ms. Gorsuch did not interview Mr. Linkous, but obtained his views on the adoption through letters from him. Ms. Gorsuch recommended granting the adoption.

Dr. William Albert Moser, a clinical psychologist, interviewed the Kingerys and the children and conducted certain psychological testing of the children. He testified that the Kingery family was an appropriate, strong family unit and that the children do not want their family unit disrupted. In his opinion, the children consider Mr. Kingery their father and want to share the Kingery last name so that they will feel secure in this family unit. Dr. Moser further testified that, in his opinion, the adoption would be in the best interest of the children, and that if it were denied, it would have a destructive impact on the children's sense of security within the Kingery family unit.

Stedson A. Linkous, III, testified that the children considered Mr. Kingery to be their father and characterized the relationship between them as a good one. With regard to the continuation of visitations with Mr. Linkous while he remains incarcerated, he testified that the one visit was "very depressing as well as aggravating" and that he did not wish to repeat the experience. After that visit, when Mr. Linkous was convicted of the conspiracy offense, Stedson testified that the publicity was embarrassing to him at school and church. Thereafter, Stedson believed the younger children should be protected from the knowledge of Mr. Linkous'

incarceration. While Stedson has continued his contact with Mr. Linkous and the Linkous family, he testified that he favored the adoption of his younger brothers.

At the conclusion of the evidence, the children's guardian *ad litem* recommended that the adoption be granted. The trial court then rendered an oral opinion which was later specifically made a part of the record in the final decree entered on December 5, 1988. By that decree, for the reasons stated in the oral opinion, the court found that Mr. Linkous had withheld his consent to the adoption contrary to the best interests of the children and granted the adoption. The decree further terminated all paternal rights of the natural father and changed the names of the children to John Michael Kingery and Matthew Benjamin Kingery.

Some of the comments and conclusions contained in the trial court's oral opinion form the basis of Mr. Linkous' assertions on appeal. While we relate them here for the purpose of addressing Mr. Linkous' assertions, we note at the outset that it is readily apparent from the full text of that opinion the trial court was well aware of the magnitude of the issue before it and the ramifications of its decision on both the children and Mr. Linkous. Clearly, the court approached its responsibility aware of the applicable case precedent and with a commendable sensitivity, not merely to the legal rights of the parties, but additionally, to the inherent emotional impact of its decision upon them. In this context, while we relate specific portions of the court's oral opinion in order to address Mr. Linkous' assertions on appeal, we ultimately review the merits of those assertions based on the totality of the evidence before the trial court and the rationale for its decision expressed by its entire oral opinion.

Pertinent to this appeal, Mr. Linkous points out that the trial court, in its oral opinion, commented that it was "disturbed" by the "half truths" of the mother and by her denial of the "obvious." The trial court found that it was "obvious" that Mrs. Kingery, despite her denials, had received financial and other aid from Mr. Linkous and his family since Mr. Linkous' incarceration and that she had not reported this to the welfare authorities. The trial court further found that the children had been denied the truth about their father's incarceration, his gifts, and his professed love for them. In addition, the court found, despite her denials, that it was "obvious that [Mrs. Kingery] had decided to cut-off

contact and communication between the children and [Mr. Linkous]" soon after their sole visit with him in the penitentiary. More significantly, the court found that the adoption was in the best interests of the children and that Mr. Linkous deserted his children by his criminal activity which amounted to "abandonment, extreme parental misconduct." Finally, and somewhat in contrast to its finding of abandonment, the court concluded that "the continued relationship with the children would be detrimental because there has been no relationship and to create a relationship is what would be detrimental." Mr. Linkous asserts that these comments and conclusions establish that the trial court misapplied the applicable case law in granting the adoption over his objection.

In summary, Mr. Linkous' assertions on appeal are as follows. First, he points out that he does not contest the suitability of Mr. Kingery as an adoptive parent. Likewise, he does not deny the existence of a bond between the children and Mr. Kingery or argue that it is not in the best interests of the children to remain in the Kingery home. He seeks only to retain his residual parental rights. He asserts that the trial court found that Mrs. Kingery was not truthful when she denied that he had provided support for the children within his limited means and that she had terminated his contact and communication with the children. Thus, he asserts the court erred in finding that his conduct rather than the conduct of the mother was responsible for the lack of contact and communication. He further asserts that his criminal activity did not involve and had nothing to do with the welfare of his children. Finally, Mr. Linkous asserts that, in finding that a continued relationship would be detrimental "because there has been no relationship and to create a relationship is what would be detrimental," the trial court erred because it ignored his legal relationship with his children. In short, Mr. Linkous asserts that the mother's conduct and not his criminal conduct terminated his relationship with his children and that his residual parental rights have been terminated based solely on his incarceration for criminal convictions. We disagree with Mr. Linkous' interpretation of the trial court's opinion.

The record is clear that the trial court was familiar with the applicable statutory and case law authority which control the issue presented by this appeal. The parties rely on the same decisions in support of their opposite positions. We review those cases

briefly here to discern the common thread among them.

Beginning in *Dyer v. Howell*, 212 Va. 453, 184 S.E.2d 789 (1971), the Supreme Court affirmed the granting of an adoption of a child by her maternal aunt and uncle over the objection of the natural father. The father had killed the child's mother but was found not guilty of murder by reason of insanity. The child had lived with her aunt and uncle since she was one year old and at the time of the hearing on the adoption petition she had lived there for almost four and one-half years. The father had remarried and was gainfully employed. The father had not supported the child during the intervening years. The child was described as "emotionally the child of" the aunt and uncle. The Court held that the child's welfare required the security and stability of remaining in the adoptive home and permitted the adoption over the objection of the natural father.

One year later, in *Malpass v. Morgan*, 213 Va. 393, 192 S.E.2d 794 (1972), the Court reversed the granting of an adoption by a stepfather over the objection of the natural father. At the time of the hearing on the adoption petition the child was six years old. Both parents had remarried, and there was no allegation of unfitness or abandonment on the part of any of the adults involved. Rather, the father exercised his visitation rights and provided support for the child. The trial court found that there were "too many fathers" in the child's life and the natural father's visitations created "friction" between the parties and "some reaction on the part of the child." The trial court concluded that the child must "be allowed to become a fully qualified member of the mother's family" and terminated the father's residual parental rights. In reversing, the Supreme Court rejected the argument that because the trial court had found that the best interests of the child would be promoted by the adoption, it automatically followed that the court should conclude that the consent of the father was withheld contrary to the best interests of the child. The Court held that the effect of this argument would permit a court to dispense with consent in all cases in which it found that adoption would promote the best interests of a child because such a finding is a prerequisite to granting an adoption in every adoption case. The Court further explained:

To promote the best interests of a child is to advance or to contribute to his interest. It would, in many cases, take but little evidence to show that a child's interests would be promoted by adoption. But to say that a certain action is contrary to the best interests of a child means that it is action opposed to his interests. When consent to adoption is withheld contrary to a child's best interests, it means that the person so withholding is "obstinately self-willed in refusing to concur" and that he is acting prejudicially to the child's interests.

*Id.* at 398-99, 192 S.E.2d at 798.

■ The Court further stated that, "[w]here . . . there is no question of the fitness of the non-consenting parent and he has not by conduct or previous legal action lost his rights to the child, it must be shown that continuance of the relationship between the two would be detrimental to the child's welfare." *Id.* at 399, 192 S.E.2d at 799. The Court held that a showing of "friction" between the contesting adults and of "some reaction" on the part of the child did not meet this test. *Id.* Finally, the Court noted that "the rights of parents may not be lightly severed but are to be respected if at all consonant with the best interests of the child." *Id.* at 400, 192 S.E.2d at 799.

■ Following *Malpass*, the Court in *Ward v. Faw*, 219 Va. 1120, 253 S.E.2d 658 (1979), reversed the granting of an adoption by a stepfather of a child six years of age over the objection of the natural father. At the time of the hearing on the adoption petition, the natural father was in the military service and had not visited with the child for three and one-half years, but had sent support and gifts. There was no allegation of unfitness or a showing that by conduct or legal action the father had lost his parental rights. The trial court found that the father and child were "strangers" and was concerned with what it described as experimenting with the future welfare of the child by visitation with the father. The Supreme Court held that *Malpass* was controlling and pointed out that "[t]he 'relationship' to be examined is not limited to a social, familial, or custodial connection which may exist between the child and the non-consenting parent. Consideration should also be given to the legal affiliation always present between parent and child." *Id.* at 1125, 253 S.E.2d at 662.

Two years later, in *Cunningham v. Gray*, 221 Va. 792, 273 S.E.2d 562 (1981), the Court reversed the granting of an adoption by a stepfather of a child nine years of age over the objection of the natural father. In *Gray*, the evidence established that the parents were divorced in New Jersey. Custody of the child was awarded to the mother and the father was granted reasonable visitation rights and ordered to pay child support. Over the next six years the father was sporadically employed, sporadically paid support and visited the child, and was convicted of trespassing and served forty days in jail. However, at the hearing on the adoption petition, the father, while unemployed, asked the court to determine the arrearage in support so that he could become current with his support obligations. He further maintained that, after the divorce in New Jersey, the mother had moved with the child to Virginia and had frustrated his efforts to talk with the child by telephone, to visit her in Virginia, and to present her with occasional gifts, all of which the mother denied. The Supreme Court held that its decision in *Ward* was controlling. Again, the Court reiterated that the adoptive parents must show that continuance of the relationship between the natural father and the child would be detrimental to the child's welfare. The Court specifically found that there was no evidence that the father's past occasional violence toward the mother, which upset the child, his poor employment record, or his conviction of a minor crime would have a definite adverse effect on the child's welfare if the father-child relationship was continued. In addition, the Court rejected the argument that the father's conduct, while in derogation of his parental duties, amounted to permanent forfeiture of his parental rights. Significantly, the Court also held that there was no indication that the father's objection to the adoption was motivated by any factor except a sincere desire to maintain a parent-child connection with his child. The Court based this determination upon the father's request that the trial court assess against him the arrearage in child support and establish specific visitation privileges.

Following *Gray*, a divided Court again reversed the granting of an adoption by a stepfather over the objection of the natural father in *Jolliff v. Crabtree*, 224 Va. 654, 299 S.E.2d 358 (1983). In *Jolliff*, the parents were divorced in Indiana, the mother was granted custody of the child, and the father was granted visitation and ordered to pay child support. Subsequently, the mother left Indiana with the child without notice or prior consultation with

the father. At that point, the Indiana court suspended the support payments pending the return of the child. Thereafter, the mother married a career Navy musician and for the next eight years the father did not know the whereabouts of his child. The father learned that the child was in Virginia when he received notice of the adoption proceedings. At that time, the father, who also had remarried, lived in California. At the hearing on the adoption petition the father testified that, while he had not contributed to the support of his child for eight years, he loved his child, was willing to support him and requested reasonable visitation privileges, but did not wish to disturb the present custody arrangements. The evidence further revealed that the child had a close personal relationship with his stepfather, referred to him as "daddy," was not acquainted with his natural father, and that the adoption proceeding was initiated at the suggestion of the child. The trial court found that there was "no relationship" between the father and child. The Supreme Court in reversing again pointed out that the trial court failed to consider the legal affiliation which is always present between parent and child and that there was no evidence that a continuance or broadening of the father-child relationship would be detrimental to the child's welfare. Chief Justice Carrico dissented, stating that, unlike *Malpass*, *Ward*, and *Cunningham*, in *Jolliff* the child's stated and obvious sincere desire to be adopted by the stepfather coupled with the lack of contact with the natural father should warrant the granting of the adoption.

■ Following *Dyer*, *Malpass*, *Ward*, *Cunningham* and *Jolliff*, in *Frye v. Spotte*, 4 Va. App. 530, 359 S.E.2d 315 (1987), we affirmed the granting of an adoption by a stepfather over the objection of the children's natural father. In *Frye*, the evidence established that the natural father did not support or maintain contact with his children, abandoned his family leaving them in necessitous circumstances, had a violent temper, and abused, sexually and otherwise, both his wife and children. In addition, one of the children made it known that she did not wish to maintain contact with her father. This evidence supported the trial court's determination that the father was withholding his consent to the adoptions contrary to the best interests of the children and that a continuation of the relationship between the father and the children would be detrimental to their welfare. In affirming the granting of the adoption in *Frye*, we pointed out that:

Finding that the continuation of a poor, strained or nonexistent parent-child relationship will be detrimental to a child's future welfare is difficult. No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold. Trial courts may, when presented with clear and convincing evidence, make an informed and rational judgment and determine that the continued relationship between a child and a non-consenting parent will be detrimental to the child's welfare.

*Id.* at 536, 359 S.E.2d at 319.

A review of the foregoing cases illustrates that a determination under Code § 63.1-225(D) that a natural parent is withholding consent to an adoption contrary to the best interests of a child involves the careful application of a series of guiding principles rather than a single one. The paramount concern is the welfare of the child, but the child's welfare must be balanced against the rights of the non-consenting natural parent. To reach that balance the court must first determine that the proposed adoption will promote the best interests of the child; that is, that the adoption will advance or contribute to the child's interests. Thereafter, the more difficult determination, which involves the permanent severance of the parent-child relationship, focuses on whether consent is being withheld contrary to the best interests of the child. To make that determination, where there is no showing that the non-consenting parent is unfit or by his conduct or previous legal action has lost his rights to the child, the party seeking adoption must produce clear and convincing evidence that a continuance of the parent-child relationship would be detrimental to the child's welfare. This determination does not lend itself to a mathematical formula. Rather, it must be approached on a case by case basis guided by certain general principles. While "no one can divine with any assurance the future course of human events, . . . past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." *Id.* Clearly, it is not sufficient if the evidence establishes only that the non-consenting parent has regularly failed to contribute child support, or failed to maintain regular visitations, or has been convicted of a minor crime. Rather, the evidence must establish that

the non-consenting parent is obstinately self-willed in refusing to consent and is acting prejudicially to the child's interest. Finally, the relationship which must be considered is not limited to a social, familial, or custodial connection, but includes the legal affiliation always present between parent and child. Thus, the balance between advancing the best interests of the child and the rights of the natural parent must give appropriate weight to the law's desire to preserve this legal relationship if at all consonant with the best interests of the child.

Guided by these general principles, we turn now to Mr. Linkous' assertions in this appeal. We begin our analysis with the familiar principles that where the trial court's decision is based upon an *ore tenus* hearing, that decision is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it. *Simmons v. Simmons*, 1 Va. App. 358, 361, 339 S.E.2d 198, 199 (1986); Code § 8.01-680. We review the totality of the evidence before the trial court and the rationale for its decision expressed by its entire oral opinion. When viewed in this context, we find no merit to Mr. Linkous' assertions.

Initially, we note, as Mr. Linkous concedes, that Mr. Kingery is a suitable adoptive parent and that the proposed adoption will promote the best interests of the children. We agree with Mr. Linkous' assertion, and the trial court's finding, that Mrs. Kingery falsely denied receiving sporadic financial assistance from Mr. Linkous and that she had not contributed to the lack of contact and communication between Mr. Linkous and his children subsequent to his incarceration. We share the trial court's concern with these denials of the "obvious." We do not agree, however, that these factors dictate a denial of the adoption petition. In addition, we agree with Mr. Linkous' assertion that to the extent the trial court found "the continued relationship with the children would be detrimental because *there was no relationship* and to create a relationship is what would be detrimental" (emphasis added), this was error. The legal affiliation between Mr. Linkous and his children existed because Mr. Linkous had not previously been divested of that relationship in any legal proceeding. In fact, he had been granted visitation privileges by the final divorce decree. In addition, the trial court did not find that Mr. Linkous was an unfit parent. Again, however, we do not believe this error dictates a denial of the adoption petition. Finally, while Mr. Linkous'

criminal conduct was and should have been an important and significant factor in the trial court's determination, we disagree with his assertion that his parental rights were terminated based solely on his incarceration for criminal convictions.

The totality of the evidence supports the trial court's finding that Mr. Linkous was withholding his consent to the adoption contrary to the best interests of his children. Prior to his incarceration, Mr. Linkous was, at best, a marginal parental figure. This was established by his sporadic and minimal financial support and contact with his children. He maintained little more than his legal affiliation with them. In only this factual context is this case comparable to the factual situations in *Malpass*, *Ward*, *Cunningham*, and *Jolliff*. Unlike those cases, this case does not involve a mere lack of financial support and contact by a non-consenting natural father. In this case, Mr. Linkous' repeated criminal conduct necessarily limited a reasonable expectation of visitation with his children during his incarceration regardless of the conduct of Mrs. Kingery in not supporting even limited visitation. While we do not decide whether prolonged incarceration resulting from convictions of serious felonies, rather than brief incarceration resulting from convictions of minor crimes as in *Cunningham*, is sufficient in itself to support a finding that a continuance of the parent-child relationship would be detrimental to the children's welfare, the particular facts of this case, coupled with those convictions, warrant such a conclusion.

Prior to his incarceration, Mr. Linkous' conduct as a father created the emotional environment in which the children's strong emotional bond with Mr. Kingery as their father figure was formed and flourished. Prior to and following that incarceration, the security of the Kingery family unit described by Dr. Moser understandably became important to the children. At the time of the *ore tenus* hearing, the children did not wish to have that security disrupted. This fact was confirmed by the testimony of Ms. Gorsuch. It is particularly significant that these events occurred while the children were still very young. When they were ages five and three respectively, Mr. Linkous began his criminal conduct which led to his prolonged incarceration. Moreover, he continued that criminal conduct after his initial incarceration. Mr. Linkous cannot maintain that he made one mistake which led to his separation from his children. Nor can he maintain that his separation

is comparable to a separation created primarily by distance as in *Malpass, Ward, Cunningham* and *Jolliff.* After his initial incarceration, Mr. Linkous continued his criminal conduct knowing, as he must have, that such conduct would prolong that separation. Because of their tender years it was understandable that the children's mother would not desire to continue to bring them to a penal institution for visitations. Mr. Linkous, if sincerely concerned with the welfare of his children, should have anticipated this reaction by the children's mother. The one visit had proven to be "aggravating" and "very depressing" to the older brother of these children. It was not incumbent upon the mother to continue such visitations. Thus, at best, Mr. Linkous' contact with the children during the period of his incarceration could only have been by mail or telephone, not a realistic proposition with children of five and three years of age who hardly knew him as their father. In addition, at the time of the *ore tenus* hearing the children were age nine and seven, respectively,. and capable of expressing their desire for the adoption and their desire to have the security of their family unit not disrupted at some indefinite future parole date.

When the totality of these factors are considered, as they were by the trial court, the evidence supports a finding that Mr. Linkous was motivated not by a sincere love for the children, but rather, by a desire to deny them the security of the Kingery family unit in the hope that he could preserve his legal affiliation with them and resume visitations at some future indefinite date determined by his parole.

In this context, the trial court correctly determined based upon Mr. Linkous' conduct over a meaningful period, what the future for these children may be expected to hold and that the continuance of the parent-child relationship would be detrimental to them and was contrary to the best interests of these children. Moreover, this evidence was sufficient for the trial court to find that Mr. Linkous was obstinately self-willed in refusing to concur with the adoption and that he was acting prejudicially to the children's best interests of maintaining the security of being a permanent part of the Kingery family unit.

For these reasons, we hold that the trial court's decision was supported by the evidence and its decision to grant the adoption is affirmed.

*Affirmed.*

Keenan, J., and Moon, J., concurred.