COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Moon, Judges Fitzpatrick and Annunziata
Argued at Salem, Virginia


JENNIFER REBECCA HICKMAN
                                        OPINION BY
v.        Record No. 2191-96-3    JUDGE ROSEMARIE ANNUNZIATA
                                        AUGUST 19, 1997
JEFFREY SCOTT FUTTY AND
 PATRICIA IRENE KENNEDY FUTTY


              FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
                   J. Samuel Johnston, Jr., Judge

              Bryan K. Selz (Overbey, Hawkins & Selz, on
              brief), for appellant.

              Betsy H. Phillips (Phillips & Morrison, on
              brief), for appellees.


     Jennifer Rebecca Hickman appeals the final order of the

circuit court granting the adoption of her child without her

consent to Jeffrey Scott Futty and Patricia Irene Kennedy Futty.

 She contends the evidence does not support the court's finding

that she withheld her consent to the adoption contrary to the

child's best interests. The disposition of this appeal turns on

a construction and application of Code § 63.1-225.1, which has

not been addressed by the Virginia appellate courts heretofore.

We find that Code § 63.1-225.1 codifies the standard promulgated

by the Virginia appellate courts in cases decided under prior law

and that the evidence in the present case supports the circuit

court's finding under that standard.

I.

K.D.M. (child) was born on February 7, 1992. Appellant, Jennifer Rebecca Hickman (Hickman), is the child's birth mother. James Clayton Miller, Sr. (Miller) is the child's birth father. Hickman and Miller were never married. They lived together until Miller was incarcerated three weeks after the child's birth, following which Hickman and the child lived at the Salvation Army. Appellees, Jeffrey Scott Futty and Patricia Irene Kennedy Futty (Futtys), thereafter took Hickman and the child into their home. Mrs. Futty is the child's paternal grandmother. Hickman remained with the child in the Futtys' home for seven weeks, until Mrs. Futty asked her to leave. Hickman was under investigation for welfare fraud, and the Futtys were granted custody of the child. In August 1992, Hickman and Miller were granted limited, supervised visitation.

In February 1996, the Futtys filed a petition to adopt the child. The Campbell County Department of Social Services (DSS) prepared a home study report addressing the placement of the child for adoption with the Futtys. Ultimately, DSS recommended the Futtys as suitable adoptive parents for the child. DSS reported that the Futtys' home was the only home the child had ever known, that the child identified only the Futtys as her parents, and that the Futtys, as well as the Futtys' children, treated the child as part of their family. The evidence showed that the child was thriving in the Futtys' home, which was

- 2 -

described as stable and loving.  There is no dispute concerning the suitability of the Futtys as custodians of the child.

Miller consented to the adoption.  Hickman did not.  At the circuit court hearing, Hickman agreed that the Futtys provided a suitable home for the child.  She disagreed, however, that the Futtys should be allowed to adopt the child.  Hickman reported to DSS that she had never been given a chance to parent the child and only wanted to prove that she could.  At the hearing, Hickman testified that she wanted the child to stay with the Futtys until she could get on her feet and establish a mother/daughter relationship.

Hickman admitted, however, that she did not have "much of a relationship" with the child.  Indeed, since she was granted visitation in August 1992, Hickman visited the child only nine times, for "very short" periods, and most recently in June 1995, eight months before the petition for adoption was filed.  Over the four-year period, Hickman phoned the Futtys only once.  Since the Futtys gained custody of the child in April 1992, Hickman had not petitioned for custody or additional visitation, and she had provided no financial support for the child.

Hickman attributed the infrequency of her visits and her failure to pursue custody to her "very abusive" relationship with Miller, which did not end until the Spring of 1995.  She testified that she was afraid of Miller and that she had not sought custody of the child because she believed it to be in the

child's best interests to remain with the Futtys while her relationship with Miller continued. Hickman also reported to DSS that she was reluctant to visit the child at the Futtys' residence because Miller was present each time she went. She reported that she wanted to visit the child without Miller being present. Hickman further reported to DSS that Mrs. Futty did not like her because she was dating a black man and that the Futtys were racist. She also testified that her visitation problems were due in part to transportation difficulties.

The Futtys denied the allegation that they were racist and denied having hindered Hickman's visitation rights. Miller testified that he had done nothing to prevent Hickman from visiting the child. The DSS social worker testified that she was unaware of any efforts by Miller to prevent visitation by Hickman, although she acknowledged that Miller had been incarcerated for thirteen months for "beating on" Hickman. The Futtys both reported to DSS and testified at the hearing that on all but one of Hickman's visitations she had accompanied Miller to visit the child. In April 1994, Hickman gave birth to another child (the infant), which Miller had fathered.

At the circuit court hearing, the DSS social worker testified that she did not believe Hickman was able to care for the child. She pointed to Hickman's difficulty in caring for the infant and noted the intervention of Child Protective Services to monitor Hickman's ability to parent the infant and a health

- 4 -

condition of the infant that required special attention.  The social worker also pointed to Hickman's recent job loss and inability to maintain a residence.  DSS reported one founded complaint against Hickman for lack of supervision and two founded complaints against Hickman and Miller for medical and physical neglect of the child.

In preparing its report, DSS attempted but was unable to contact Hickman in June and July 1995 at the address they had listed for her.  Subsequently, DSS scheduled a home visit with Hickman at another address.  When DSS arrived, the homeowner reported that she had taken Hickman in because Hickman was her son's friend.  One morning, the homeowner woke to find Hickman and the infant asleep on her back porch.  Eventually, however, the homeowner "kicked [Hickman] out, [because she] could not put up with her laziness."  The homeowner reported that "[a]ll [Hickman] wanted to do was sleep all day and eat.  She did not want to get a job and help pay for food."  The homeowner provided DSS a forwarding address at which DSS was able to locate Hickman. Hickman and the infant subsequently left that address and lived in an emergency shelter, following which they again lived with "some friends."  DSS reported that most recently, Hickman and the infant were living in a residence with nine other people. Hickman testified that since August 1992, she had been incarcerated three times, twice for two-week periods and once for a month.  She further testified that since leaving the Futtys'

residence in April 1992 she had lived in eight separate locations.

DSS reported that Hickman had been fired from a job at Hardee's. By the time of the hearing, Hickman had regained her employment at Hardee's, having worked at McDonald's and Subway in the interim. At the hearing, Hickman testified that she had acquired a car two days earlier and that she expected to have an apartment of her own in two months.

Upon the evidence adduced at the hearing and upon consideration of the DSS reports, the trial court found by clear and convincing evidence that: (1) Hickman had made little or no effort to obtain or maintain legal and physical custody of the child; (2) the Futtys had done nothing to thwart Hickman's efforts to assert her parental rights; (3) Hickman was unable to care for the child; (4) the child is over four years of age; (5) there had been no previous relationship between Hickman and the child or between the child and the infant; (6) the child has a good relationship with the Futtys' other children; (7) Hickman admitted that the Futtys had taken good care of the child and could find no fault in the custodial environment they provided; (8) the child had been with the Futtys continuously since a few weeks after her birth; and (9) that any change of custody would be emotionally devastating to the child. The court accordingly found that Hickman was withholding her consent to the child's adoption contrary to the child's best interests and granted the

adoption over Hickman's objection.

II.

Adoption of a child may be ordered without the consent of the child's birth parent if that parent's consent to the adoption is being withheld "contrary to the best interests of the child as set forth in [Code] § 63.1-225.1."  Code § 63.1-225(F).  In determining whether such consent is being withheld "contrary to the best interests of the child," the court shall consider "whether the failure to grant the petition for adoption would be detrimental to the child."  Code § 63.1-225.1.  In determining whether the failure to grant the adoption would be detrimental to the child, the court shall consider "all relevant factors," including: (1) the birth parent's efforts to obtain or maintain legal and physical custody of the child; (2) whether the birth parent's efforts to assert parental rights were thwarted by other people; (3) the birth parent's ability to care for the child; (4) the child's age; (5) the quality of any previous relationship between the birth parent and the child and between the birth parent and any other minor children; (6) the duration and suitability of the child's present custodial environment; and (7) the effect on the child of a change of physical custody.  Id.

Code § 63.1-225.1, enacted in 1995, codifies the standard promulgated by the Virginia appellate courts in cases decided under prior law, when the statute contained no explicit standard.  See Linkous v. Kingery, 10 Va. App. 45, 390 S.E.2d 188 (1990); Frye v. Spotte, 4 Va. App. 530, 359 S.E.2d 315 (1987); Jolliff v.

- 8 -

Crabtree, 224 Va. 654, 299 S.E.2d 358 (1983); Cunningham v. Gray, 221 Va. 792, 273 S.E.2d 562 (1981); Ward v. Faw, 219 Va. 1120, 253 S.E.2d 658 (1979); Malpass v. Morgan, 213 Va. 393, 192 S.E.2d 794 (1972).  Under those cases, the determination of whether consent to adoption was being withheld "contrary to the best interests of the child" required an analysis of "the full breadth of the parent-child connection in all its dimensions," Ward, 219 Va. at 1125, 253 S.E.2d at 662, through "the careful application of a series of guiding principles."  Linkous, 10 Va. App. at 56, 390 S.E.2d at 194.

Under those principles, the placement of the child in the prospective adoptive home must have furthered the child's best interests.  The child's good relationship with the prospective adoptive parents and the ability of the prospective adoptive parents to suitably provide for the child were common factors in each of the prior cases.  See Linkous, 10 Va. App. at 57, 390 S.E.2d at 195; Frye, 4 Va. App. at 534, 359 S.E.2d at 318; Jolliff, 224 Va. at 656, 299 S.E.2d at 359; Cunningham, 221 Va. at 794, 273 S.E.2d at 563; Ward, 219 Va. at 1122, 253 S.E.2d at 660; Malpass, 213 Va. at 395, 192 S.E.2d at 796.  Indeed, were the prospective adoptive parents found to be unfit to provide for the child, consent to the adoption could hardly be withheld contrary to the child's best interests.

Under the prior cases, however, the suitability of placement in the prospective adoptive home was not alone sufficient to

warrant a finding that consent to the adoption was being withheld contrary to the child's best interests.  E.g., Malpass, 213 Va. at 398–99, 192 S.E.2d at 798; Linkous, 10 Va. App. at 56, 390 S.E.2d at 194.  Indeed, were that the case, the consent requirement of the adoption statute would be meaningless, see Malpass, 213 Va. at 398, 192 S.E.2d at 798, and, in practical effect, the court could forever divest a natural parent of all rights and obligations with respect to the child, see Frye, 4 Va. App. at 533, 359 S.E.2d at 316, simply by finding placement in the prospective adoptive home more suitable to the child than placement with the child's birth parent.  Instead, the relationship between the child and his or her birth parent had to be considered.  E.g., Linkous, 10 Va. App. at 56, 390 S.E.2d at 194.  Where the continued relationship between parent and child would be detrimental to the child's welfare, it would follow that consent to the adoption was being withheld, not in the child's interests, but as an "obstinately self-willed" act in "prejudic[e] to the child's interest."  Id. at 57, 390 S.E.2d at 194.

> Under the prior cases, the Court recognized that [f]inding that the continuation of a poor, strained or nonexistent parent-child relationship will be detrimental to a child's future welfare is difficult.  No one can divine with any assurance the future course of human events.  Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold.  Trial courts may, when presented with clear and convincing evidence, make an informed and rational

> judgment and determine that the continued relationship between a child and a non-consenting parent will be detrimental to the child's welfare.

Frye, 4 Va. App. at 536, 359 S.E.2d at 319. The relationship between child and birth parent was evaluated, in part, in terms of the birth parent's fitness to provide for the child. Where there was no question of the fitness of the birth parent and that parent had not, by conduct or legal action, lost his or her rights to the child, it had to be shown that continuance of the parent-child relationship would be detrimental to the child's welfare. E.g., Malpass, 213 Va. at 399, 192 S.E.2d at 799; Linkous, 10 Va. App. at 56, 390 S.E.2d at 194. And, even where the parent proved unfit, the unfitness had to make the continuance of the relationship detrimental to the child's welfare. Lyle v. Eskridge, 14 Va. App. 874, 876-77, 419 S.E.2d 863, 865 (1992) (quoting Doe v. Doe, 222 Va. 736, 746, 284 S.E.2d 799, 805 (1981)).

The relationship between child and birth parent was also evaluated qualitatively, in terms of the birth parent's contact with the child since his or her separation from the child. E.g., Malpass, 213 Va. at 395, 192 S.E.2d at 796; Jolliff, 224 Va. at 656-57, 299 S.E.2d at 359-60. The adverse consequences of sporadic, or even non-existent, visitation patterns were tempered by evaluating the extent to which, if at all, efforts at visitation were thwarted by the child's custodian. E.g., Jolliff, 224 Va. at 657, 299 S.E.2d at 360; Frye, 4 Va. App. at

- 11 -

534, 359 S.E.2d at 318.  The quality of the relationship was also evaluated in terms of any prior abuse of the child by the non-consenting parent.  Frye, 4 Va. App. at 534-35, 359 S.E.2d at 318-19.  Finally, the relationship evaluated was not limited to a "social, familial, or custodial connection, but [also] include[d] the legal affiliation always present between parent and child." Linkous, 10 Va. App. at 57, 390 S.E.2d at 194.

Under the prior case law, the totality of these factors was evaluated to strike the appropriate balance between the best interests of the child and the rights of the non-consenting, natural parent.  Linkous, 10 Va. App. at 56, 390 S.E.2d at 194. In Malpass, Ward, and Jolliff, the fitness of the non-consenting parent was undisputed, and, after consideration of the "full breadth of the parent-child connection in all its dimensions," the Court in each case concluded that consent was not being withheld contrary to the child's best interests.

In Malpass, the non-consenting parent had maintained a regular pattern of visitation and support, when such efforts were not thwarted by the child's custodian.  There was no showing in Malpass that the child's continued relationship with the non-consenting parent would be detrimental to the child's welfare; it was only established that "friction" would be created by the non-consenting parent's continued visitation.  Such "friction" was not sufficient to support the finding that consent had been withheld contrary to the child's best interests.

In Ward, the non-consenting parent paid support for the child, sent the child gifts on a regular basis, and alleged that the child's custodian had thwarted his efforts to visit the child. The Court found that the non-consenting parent had maintained a social and familial relationship with the child and emphasized the legal relationship that the non-consenting parent continued to share with the child.

In Jolliff, although the non-consenting parent had not seen the child in eight years, the evidence showed that his ability to do so had been rendered impossible by the actions of the child's custodian: for eight years the non-consenting parent did not know the location of the child. The evidence further showed that the non-consenting parent was willing to visit and support the child, and the Court again emphasized the continuation of the legal relationship between parent and child.

In Cunningham, Frye, and Linkous, by contrast, the relative unfitness of the non-consenting parent was an important factor. In Cunningham, the evidence showed that the non-consenting parent had a poor employment record, that he had been convicted of a minor crime, that there was "friction" between the child's natural parents, and that the non-consenting parent's occasional violence toward the custodial parent upset the child. On balance, however, the Court found that the evidence did not support a finding that the continuation of the parent-child relationship would have been disruptive to the child. Although

the non-consenting parent had seen the child only once in approximately five years, he alleged that his efforts to visit the child had been thwarted by the custodial parent.  Indeed, the evidence showed that the custodial parent relocated with the child from New Jersey, where the non-consenting parent resided, to Virginia.  The evidence also showed that although his pattern of support had been sporadic, the non-consenting parent intended to support the child into the future and to satisfy a child support arrearage he owed.  Finally, the evidence showed that the non-consenting parent's objection to the adoption was not motivated by anything but a sincere desire to maintain the parent-child connection with his daughter.

In Frye, the non-consenting parent's fitness and the quality of the parent-child relationship were undermined by evidence of physical and sexual abuse by the non-consenting parent against the custodial parent and his adopted child and stepchild.  The evidence also showed that the non-consenting parent had provided sporadic, if any, support of the children and that he had visited them only four or five times since he deserted them and made frequent trips to the area without contacting them.  The evidence did not support an allegation that the custodial parent had thwarted the non-consenting parent's efforts to visit the children.  The evidence further showed that the non-consenting parent had deserted his children, leaving them in necessitous circumstances, and showed no interest in them until the filing of

the petition for adoption. On balance, the Court found that the evidence supported a finding that the continued relationship would be detrimental to the children and thus concluded that consent was being withheld contrary to their best interests.

In Linkous, the non-consenting parent was incarcerated, serving a thirty-two year sentence, and, while incarcerated, he was convicted of another offense and received an additional ten year sentence. The non-consenting parent was able to visit the children only once since his incarceration. While the evidence showed that the custodial parent refused to take the children to the prison for further visits, the evidence supported that decision on the ground that the prison visits were detrimental to the children. The evidence showed that the non-consenting parent had been only a "marginal" parent before his incarceration and that the children would have nothing but a legal relationship with him in the future. The Court found that the non-consenting parent's unfitness was compounded by the occurrence of his repeated criminal activity and, on balance, found the continuation of the relationship to be detrimental to the children. Thus, the Court concluded that consent was being withheld contrary to the children's best interests.

The balance struck in these prior cases is achieved through an application of the factors enumerated in Code § 63.1-225.1. Those factors encompass both aspects of the standard developed in the prior case law: a court must consider the relationship

between the child and the prospective adoptive parents as well as the relationship between the child and the non-consenting parent. A finding with respect to only one of these relationships is insufficient. Under Code § 63.1-225.1, as under the prior case law, not only must the prospective adoptive placement serve the child's best interests, but the continued relationship with the non-consenting parent must prove to be detrimental. Detriment is determined, as it was under the prior case law, by considering the non-consenting parent's fitness, or ability, to parent the child as well as the relationship the non-consenting parent maintains with the child and other children, if any. That relationship, as it was under the prior case law, is evaluated in terms of the non-consenting parent's willingness to provide for the child, that parent's record of asserting parental rights, taking into consideration the extent to which, if any, such efforts were thwarted by other people, and the quality of the parent-child relationship.

In sum, the factors enumerated in Code § 63.1-225.1 compel the court to consider the child's best interests vis-a-vis both the prospective adoptive parents and the parent whose consent to the adoption is being withheld. Where the evidence reveals that adoption would be in the child's best interests and the continued relationship with the non-consenting parent would be detrimental, it follows that the failure to grant the adoption would be detrimental to the child. In such a case, the conclusion that

consent is withheld contrary to the child's best interests is compelled.

In the present case, the trial court tracked Code § 63.1-225.1 and found by clear and convincing evidence that Hickman withheld her consent to the adoption contrary to the child's best interests. "The trial court's decision, when based upon an <u>ore tenus</u> hearing, is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." <u>Frye</u>, 4 Va. App. at 537, 359 S.E.2d at 319-20. We find that the record supports the trial court's decision.

There is no dispute with respect to the suitability of the Futtys as parents for the child. They are the only parents the child has known, and they and their children have integrated the child into their family structure. Indeed, Hickman admitted at the hearing that the Futtys provided a suitable home for the child and she stated that she did not seek to change the child's custodial placement for the foreseeable future.

The child's relationship with Hickman is clearly strained and tenuous. Hickman admitted at the hearing that she did not have "much of a relationship" with the child, and the record shows that her choices, decisions and conduct reflected little interest in the child prior to the Futtys' petition for adoption. The evidence showed that Hickman had made little, if any, attempt to establish a relationship with the child since the

child was placed in the Futtys' custody. Hickman never sought to regain custody of the child, which she lost within two months of the child's birth. Furthermore, the evidence showed that in nearly four years since Hickman was granted visitation rights, she had visited the child only nine times and had phoned the Futtys only once. The evidence further showed that Hickman provided no support for the child while she was in the Futtys' care, nearly the child's entire life.

Hickman alleged that she was thwarted in her attempts to visit the child, but the evidence supports the trial court's finding to the contrary. Mrs. Futty, Miller, and the DSS social worker all testified that no one had thwarted Hickman's attempt to exercise her parental rights. Hickman alleged that she was afraid of Miller, who was present at the Futtys' home when she went to visit. The evidence showed, however, that on all but one of Hickman's visits, Hickman accompanied Miller to the Futty residence. Moreover, Hickman gave birth to another child fathered by Miller more than two years after her first child was placed in the Futtys' custody. In any event, Hickman made no effort to modify the situation and establish visitation elsewhere.

Furthermore, Hickman's ability to parent the child clearly weighed in the court's determination, and the evidence supports the trial court's finding that Hickman is unable or unwilling to care for the child. The evidence showed that Hickman had several

founded complaints for child neglect with DSS and that DSS had been monitoring Hickman's relationship with her other child. The evidence further showed that Hickman had been incapable of maintaining a permanent residence or employment. Aside from her three periods of incarceration, Hickman resided in eight separate locations during the relevant time period.

In sum, the choices Hickman exercised in relation to the parent-child relationship manifest a failure of both her willingness and ability to parent the child. The factors addressing the child's relationship with Hickman and those addressing the child's relationship with the Futtys support the conclusion that failure to grant the adoption would be detrimental to the child. Accordingly, the evidence supports the trial court's finding that Hickman withheld her consent to the adoption contrary to the child's best interests.

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.