COURT OF APPEALS OF VIRGINIA


Present:  Judges Bumgardner, Kelsey and Senior Judge Hodges


FRANK L. McCRAY

                                          MEMORANDUM OPINION*
v.   Record No. 2940-02-3                    PER CURIAM
                                           APRIL 29, 2003
SAMUEL W. LAW, MARCELLA L. LAW
 AND KIMBERLY NICOLE LAW


                FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
                        Thomas H. Wood, Judge

          (Deborah Anne Gartzke, on brief), for
          appellant.

          (Victor V. Ludwig; Nelson, McPherson,
          Summers & Santos, L.C., on brief), for
          appellees.


     Frank L. McCray (McCray) contends the trial court erred in

(1) finding that a continuance of the parent-child relationship

would be detrimental to the children; (2) finding that McCray, the

non-consenting parent, had "by his conduct or previous legal

action lost his right to his children"; and (3) failing to

consider the efforts of Mr. and Mrs. Law in "thwarting [his]

efforts to assert his parental rights when it found that failure

to grant the adoptions would be detrimental to the children."

Upon reviewing the record and briefs of the parties, we conclude

_____

      * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

that this appeal is without merit.  Accordingly, we summarily

affirm the decision of the trial court.  See Rule 5A:27.

BACKGROUND

Marcella and Samuel Law (hereinafter, the Laws, or mother and

Law, respectively) were married in 1978 and have lived

continuously as husband and wife since that time.  Mother gave

birth to two children:  KNL, born on October 30, 1984; and JAL,

born on April 20, 1991.  DNA tests conducted in 1994 showed that

McCray was the biological father of the two children as a result

of an ongoing extra-marital affair between mother and McCray.  The

children have lived continuously with the Laws since their births,

and the Laws have lived at the same address since 1992.

On June 13, 2001, with mother's consent, Law filed a petition

to adopt the children.  In the petition, the Laws advised the

trial court that McCray refused to consent to the adoptions and

asked that the trial court find that McCray was withholding

consent contrary to the best interests of the children.

On June 18, 2002, the trial court conducted a hearing on the

adoption petition.  At the time of the hearing, KNL was seventeen

years old and JAL was eleven.

The evidence showed that McCray "attempted to obtain

visitation with the children" in 1992.[1]  On October 6, 1994,

---

[1] In lieu of a transcript of that hearing, the record
contains a statement of facts and "Objection[s] to and
Amplification of [the] Statement of Facts" filed with the trial
court.

- 2 -

McCray, the Laws and the children's guardian ad litem appeared in juvenile court on McCray's "petition for custody and visitation." The juvenile court found that McCray "has not had any contact with said children for almost two years" and that the mother has not petitioned for child support during that time. The parties agreed that "McCray will voluntarily suspend his rights of visitation with said children and that the mother, Marcella Law will not demand child support." The order also noted that mother's husband, Law, "can capably support said children without any assistance from . . . McCray." As a result, the juvenile court "suspended" McCray's "visitation rights" and his "obligation to support said children." In the order, the "parties reserve[d] the right to petition the court for visitation or support without the necessity of showing a change of circumstance."

Law recalled only one instance when McCray contributed to either child's financial welfare, that being in 1991 when McCray contributed to help pay "some medical expenses." Except for a telephone call in 2001, McCray "had not telephoned the children, sent them gifts, holiday cards, birthday cards, or written any letters to them" since 1992. Law testified that both children have their own room, do well in school, participate in

---

The Laws corrected the statement of facts to indicate that the parties stipulated that McCray filed his petition for visitation in 1992, rather than 1994. However, page 5 of the statement of facts, which the parties failed to correct, recites that "McCray testified that in 1994, he filed petitions for visitation."

- 3 -

extracurricular activities and have never been in trouble.  Law has worked for the same employer for twelve years, makes approximately $53,000 per year, carries the children on his health insurance and loves the children as if they were his own.

KNL testified that she last saw McCray "when she was in the second grade, and had not received any calls, letters, cards or gifts from him since then."  She recalled McCray having a bad temper, calling her a "'little bitch'" and throwing a rock at her mother.  She also related an incident when McCray "massaged her upper thigh in a way that made her feel uncomfortable."  KNL has "no interest in having a [parental] relationship with McCray."  She loves Law and wants him to adopt her.

JAL did not learn that McCray was his biological father until July 2001.

Dr. Nadia Kuley, a clinical psychologist, began seeing the children for counseling in August 2001, "addressing the issues of their adoption by Samuel Law without the biological father's consent and the children's psychological status."  Dr. Kuley testified that JAL "was having difficulty sleeping, felt insecure, and was afraid he would be taken away from the Laws."  Dr. Kuley opined "that it would be detrimental to the children's best interests if Law were not permitted to adopt them."  She added that JAL is "very troubled" that the adoption might be thwarted, and if unsuccessful, the impact on JAL "would be 'devastating.'"  Dr. Kuley conceded "it is possible to develop a father-child

relationship in circumstances like these if the child is motivated to do so."

McCray testified he visited the Laws' house on Saturday nights "during his lengthy affair with [mother]." In 1990 or 1991, he obtained a house at which mother visited with KNL. However the relationship "was rocky," and mother terminated contact around 1992. McCray admitted "his contact with [KNL] was 'very rare,'" involving only "brief" contact. He averred "he did not see or attempt to contact the children after" December 26, 1991. According to McCray, he filed petitions in juvenile court in 1994 for visitation, however, his financial situation was so poor he "had no money to do activities with the children." An attorney advised McCray that if he signed the 1994 Order of Agreement, he could "re[-]petition the Court at any time for visitation." McCray said he was afraid to contact the Laws because of a previous stalking charge, so he did not attempt any contact until he telephoned them in April 2001.

At the conclusion of the evidence, the trial court ruled that "clear and convincing evidence" established that "continuance of the parent-child relationship would be detrimental to the child[ren]'s welfare."

ANALYSIS

I.  Insufficient Evidence That Continued Relationship Between
McCray and the Children Would Be Detrimental

Under familiar principles of appellate review, we consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Laws, the parties who prevailed below.  See Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990).  Thus, all evidence in conflict with the Laws' evidence must be disregarded.  See Garst v. Obenchain, 196 Va. 664, 668, 85 S.E.2d 207, 210 (1955).  When the trial court's decision is based, as here, on an ore tenus hearing, it "is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it."  Frye v. Spotte, 4 Va. App. 530, 537, 359 S.E.2d 315, 319-20 (1987).  Furthermore, it is well settled that "the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony."  Anderson v. Anderson, 29 Va. App. 673, 686, 514 S.E.2d 369, 376 (1999).

"An adoption over objection by a natural parent should not be granted except upon clear and convincing evidence that the adoption would be in a child's best interest and that it would be detrimental to continue the natural parent-child relationship."  Frye, 4 Va. App. at 532, 359 S.E.2d at 317.  In making that determination, the trial court must "consider the

child's best interests vis-a-vis both the prospective adoptive parents and the parent whose consent to the adoption is being withheld." Hickman v. Futty, 25 Va. App. 420, 432, 489 S.E.2d 232, 237 (1997). In determining whether the withholding of consent is contrary to the child's best interests, the court must "consider whether the failure to grant the petition for adoption would be detrimental to the child." Id. at 426, 489 S.E.2d at 234-35 (citing and listing factors in former Code § 63.1-225.1).[2]

> Detriment is determined . . . by considering
> the non-consenting parent's fitness, or
> ability, to parent the child as well as the
> relationship the non-consenting parent
> maintains with the child and other children,
> if any. That relationship . . . is
> evaluated in terms of the non-consenting
> parent's willingness to provide for the
> child, that parent's record of asserting
> parental rights, taking into consideration
> the extent to which, if any, such efforts
> were thwarted by other people, and the
> quality of the parent-child relationship.

Id. at 431-32, 489 S.E.2d at 237; see also Code § 63.2-1205 (setting forth the "relevant factors" a court must consider).

> Where the evidence reveals that adoption
> would be in the child's best interests and
> the continued relationship with the
> non-consenting parent would be detrimental,
> it follows that the failure to grant the
> adoption would be detrimental to the child.

___

[2] Code § 63.1-225.1 was repealed and recodified in 2000 as Code § 63.1-219.13. In October 2002, Code § 63.1-219.13 was repealed and recodified as Code § 63.2-1205.
Likewise, Code § 63.1-225(F) was also repealed and recodified in 2000 as Code § 63.1-219.11, which in October 2002, was repealed and recodified as Code § 63.2-1203.

> In such a case, the conclusion that consent
> is withheld contrary to the child's best
> interests is compelled.

Hickman, 25 Va. App. at 432, 489 S.E.2d at 237-38.

Here, the evidence supports the trial court's findings that McCray withheld consent contrary to the best interests of the children and that McCray's continued relationship with the children would be detrimental.

The Laws have provided supervision and a positive home environment where the children are thriving academically, socially and emotionally. In contrast, other than providing "some" financial assistance in 1991 when KNL hurt her arm, McCray provided no financial assistance to the children. McCray's last contact with KNL was in 1991, when she was seven years old. The record proved the contact was "rare" and "brief." KNL recalled appellant's bad temper and aggressive nature, as well as an incident where he made her feel uncomfortable. McCray has had no contact with JAL. In 1994, McCray consented to the terms of an Agreed Order whereby his "visitation rights with [the] children" and his "obligation to support" them was suspended. The record fails to show that McCray ever exercised his right to petition the court for visitation after entry of that 1994 order.

We distinguish the cases cited by appellant to support his argument. First of all, unlike McCray and mother's situation,

those cases involved married partners who had a child and later divorced.

In Ward v. Faw, 219 Va. 1120, 1122, 253 S.E.2d 658, 660 (1979), the natural father, a serviceman, was sent overseas when the child was very young. The mother obtained a divorce a year later, gaining custody of the child. Id. Husband was ordered to pay child support and was granted reasonable visitation. Three years later, mother and her new husband petitioned for adoption. Id. The evidence showed that the natural father had not seen his son for over three years and only once since the divorce, and the child was not familiar with his natural father. However, unlike McCray, the father in Ward "made the child support payments regularly, . . . repeatedly mailed greeting cards . . . upon special occasions, and also forwarded gifts to his son." Id. at 1122-23, 253 S.E.2d at 662. Moreover, there was no evidence that continuing the parent-child relationship would have an adverse effect. Thus, the Supreme Court reversed the trial court's decision to grant the adoption petition, holding that the "'adoptive parent [failed] to establish by [clear and convincing] evidence that continuance of the relationship between the father and child would be detrimental to the child's welfare.'" Id. at 1125, 253 S.E.2d at 661.

In Cunningham v. Gray, 221 Va. 792, 793, 273 S.E.2d 562, 563 (1981), a New Jersey couple divorced when the child was three years old. Father was granted visitation and ordered to

pay child support.  Id.  A year later, mother moved with the child to Virginia and remarried.  Id.  Five years later, she and her new husband petitioned for adoption.  Id. at 794, 273 S.E.2d at 563.  The natural father, who remained in New Jersey, did not pay child support and only saw the child once after mother moved.  Id.  However, the natural father's parents visited annually with the child, and the mother testified that the child was aware of her natural father and maintained a scrapbook about him.  Id. at 794, 273 S.E.2d at 563.  The Supreme Court reversed the trial court's decision to grant the petition for adoption, holding that "[t]he record here, as in Ward, is completely devoid of any evidence that continuance of the present limited relationship between Cunningham and his daughter, or any broadening of that relationship which may occur in the future, will be disruptive of the child's well-being."  Id. at 795, 273 S.E.2d at 564.

In Jolliff v. Crabtree, 224 Va. 654, 655, 299 S.E.2d 358, 359 (1983), an Indiana couple divorced when their child was twenty-one months old.  The Indiana court awarded mother custody of the child and child support and granted the husband weekly visitation.  Id.  Two months after the divorce, the mother left Indiana with the child and "moved to Florida without any notice or prior consultation with the child's father."  Id.  A year later, the mother remarried a serviceman whose job required them to periodically move to other military locations.  Id. at 656,

- 10 -

299 S.E.2d at 359. Several years later, the stepfather and mother petitioned for adoption, but the father refused consent. Id. He said he loved his child, he was always willing to support him and "alleged that it had been impossible for him to exercise visitation rights since he did not know the location of his child until the adoption petition was filed." Id. at 658, 299 S.E.2d at 360. Relying again on the rule expressed in Ward, the Supreme Court reversed on the basis that the "'adoptive parent [failed] to establish by the [appropriate quantum of] evidence that continuance of the relationship between the father and child would be detrimental to the child's welfare.'" Id. at 658, 299 S.E.2d at 359 (quoting Ward, 219 Va. at 1125, 253 S.E.2d at 661).

Unlike the parties whose granted petitions were reversed on appeal, the Laws presented evidence through KNL and Dr. Kuley that continuing or creating a parent-child affiliation between McCray and the children would be detrimental. Dr. Kuley testified "that it would be detrimental to the children's best interests if Law were not permitted to adopt them."

KNL could recall only negative experiences with McCray, experiences suggesting an unhealthy relationship, which might cause anxiety on the part of KNL. Moreover, KNL, who was seventeen at the time of hearing, and is now eighteen, expressed a desire to be adopted by Law. She also expressed her desire not to maintain, or enter into, a parent-child relationship with McCray.

- 11 -

The detrimental effect on JAL was more severe and obvious because he was younger and did not know McCray.  Dr. Kuley unequivocally opined that denying the petition would "devastate" JAL and make him more insecure.  He has difficulty sleeping and is insecure and fearful that he will be taken from his mother and Law.  Although Dr. Kuley explained that "it is possible to develop a father-child relationship in circumstances like these," she conditioned that on "the child [being] motivated to do so."  Here, neither child is motivated to enter into such a relationship.

The record contains sufficient evidence from which the trial court could find by clear and convincing proof that continuing a parent-child affiliation between McCray and the children would be detrimental.

## II.  Insufficient Evidence to Support Finding that McCray Lost His Rights to His Children

In Paragraph 6 of the final order, the trial court stated:

> In October 1994, McCray agreed to a suspension of his visitation rights in exchange for relief from any obligation of support for the Child[ren], and, although McCray has known where the Child[ren] ha[ve] resided since 1994, he has made no effort to contact the Child[ren] in any way, which conduct together with other conduct of which there was evidence, constitutes an abandonment of the Child[ren].

McCray contends the trial court erroneously relied on the Agreed Order and his lack of contact to find abandonment, grant the adoption petition, and sever his parental rights.  He argues that he tried to assert his parental rights "by filing petitions

- 12 -

for visitation in 1992, [and] trying to reestablish contact by telephone in 2001 and then filing petitions for visitation in 2001."

As explained in Part I., supra, the Laws presented detailed expert evidence through Dr. Kuley that denying the petition and continuing the "relationship" between McCray and the children would be detrimental to the children. In Cunningham, a case upon which McCray relies, the petitioning party presented no evidence that continuing the parent-child relationship would be detrimental. Here, the Laws presented sufficient evidence of detriment.

Despite the finding of abandonment, the record contains other evidence demonstrating that continuing the relationship would be detrimental. The trial court's analysis and finding of abandonment was merely a means of considering and weighing the statutory factors in judging McCray's "efforts to assert parental rights" and the "quality of any previous relationship" between the children and McCray. Code § 63.2-1205 (formerly Code § 63.1-219.3).

> "[F]inding that the continuation of a poor, strained or nonexistent parent-child relationship will be detrimental to a child's future welfare is difficult. No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold. Trial courts may, when presented with clear and convincing evidence, make an informed and

- 13 -

> rational judgment and determine that the continued relationship between a child and a non-consenting parent will be detrimental to the child's welfare."

*Hickman*, 25 Va. App. at 428, 489 S.E.2d at 235-36 (quoting *Frye*, 4 Va. App. at 536, 359 S.E.2d at 319).

The record supports a finding, apart from abandonment or lack of contact, that continuing the relationship would be detrimental. Accordingly, the finding of abandonment does not constitute reversible error.

### III. Trial Court Did Not Take Into Account Evidence That McCray's Efforts to Assert His Parental Rights Were Thwarted by the Laws

In its final orders, the trial court noted that it considered the evidence heard *ore tenus* as well as the statutory factors set out in Code § 63.1-219.13 (now Code § 63.2-1305) in finding that "McCray's consent is being withheld contrary to the best interests of the Child[ren]."

The trial court heard the evidence *ore tenus*, thus its findings are entitled to the weight of a jury verdict and will not be disturbed unless plainly wrong or without evidence to support them. *Alls v. Alls*, 216 Va. 13, 14, 216 S.E.2d 16, 17 (1975). The record does not support appellant's assertion that the trial court improperly refused to consider efforts by the Laws to thwart him from asserting his parental rights. Moreover, credible evidence supports the finding of the trial court.

We cannot say that the trial court's decision was plainly wrong or without evidence to support it.  Accordingly, the decision of the circuit court is summarily affirmed.

<u>Affirmed.</u>