COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Huff and Senior Judge Clements

JASMINE ANDERSON

v.     Record No. 2166-11-3

LYNCHBURG DEPARMENT
OF SOCIAL SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
MARCH 27, 2012

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
J. Leyburn Mosby, Jr., Judge

(Herbert E. Taylor, III; Herbert E. Taylor, III, P.C, on brief), for
appellant.

(Susan L. Hartman, Assistant City Attorney; David E. Mass,
Guardian *ad litem* for the minor children, on brief), for appellee.


By order entered on September 29, 2011, the trial court terminated the residual parental

rights of Jasmine Anderson, mother, to her minor children, D.D. and J.D., pursuant to Code

§ 16.1-283(C)(2).  On appeal of this decision, mother challenges the sufficiency of the evidence to

support the terminations.  Upon reviewing the record and briefs of the parties, we conclude this

appeal is without merit.  Accordingly, we summarily affirm the decision of the trial court.  See Rule

5A:27.

Background

On appeal, we view the evidence in the "'light most favorable' to the prevailing party in the

circuit court and grant to that party the benefit of 'all reasonable inferences fairly deducible

therefrom.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767

(2005) (quoting Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

460, 463 (1991)). When reviewing a decision to terminate parental rights, we presume the circuit court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Id. at 265-66, 616 S.E.2d at 769 (quoting Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. at 266, 616 S.E.2d at 769 (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted)). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)).

The minor children, D.D. and J.D., were first removed from the custody of mother on April 12, 2007 after mother had issues involving unstable housing, erratic employment, positive drug screens, and domestic violence. Mother also failed to fully cooperate with the Lynchburg Department of Social Services (DSS) in accordance with child protective orders entered by the Lynchburg Juvenile and Domestic Relations District Court (JDR court). In February 2009, the JDR court entered orders terminating mother's parental rights to D.D. and J.D. and approving foster care plans with goals of adoption. Mother appealed the cases to the trial court, which on March 5, 2010, entered orders dismissing the petitions for termination, finding mother had shown good cause for her failure to make sufficient progress in her "individual counseling" and she had made some progress in maintaining employment and housing. The trial court also ordered DSS to file new foster care plans with goals of "return to home" and to arrange counseling for mother and visitation with the children.

DSS began telephone contact between mother and the children and eventually visitation with the children. DSS referred mother to a health care center for a medication management

appointment, but she failed to follow through. Mother resumed counseling and initially was more consistent with attending the sessions.

The two children struggled after resuming contact with mother. Dr. Joseph C. Conley, Jr., Ph.D., performed a neuropsychological evaluation of D.D. In his opinion, it appeared likely that the resumption of contact with mother had "re-aroused intense underlying emotional conflicts generated by the nature/quality of his relationship" with mother. Dr. Conley found it "reasonable to conclude that curtailment of further contact with mother" would be in D.D.'s best interests. However, because the goals of the foster care plans were "return to home," DSS worked closely with counselors for both mother and the children in an effort to continue the visitations. The children returned to mother's home on a trial basis on July 30, 2010.

Jennifer Taylor, a foster care worker at DSS, testified that after the children returned to mother's home, they exhibited aggressive behavior and began to lie and steal. One of the children displayed sexualized behavior, and the other became anxious and fearful. Taylor also determined that mother had not followed through with daycare arrangements made by DSS and mother had not been working. In addition, Taylor learned mother had filed domestic violence charges against Donte Dorsey, Sr., who was seen in the home on several occasions.

Mary Rice, a licensed professional counselor, provided counseling services to mother starting in January 2010. She stated mother attended the sessions regularly until March 2010 when her attendance became more sporadic. Rice learned that Dorsey had been released from jail in February or March 2010. Rice stated she typically scheduled weekly appointments with mother, but mother attended only seven appointments in a five-month time period and canceled several appointments in August 2010. Rice stated that in counseling mother addressed issues of prioritizing the needs of her children and domestic violence and its effect on the lives of her children, among

other topics. Rice stated mother was making progress with her counseling, but Rice became concerned mother would fall back into the cycle of abuse when Dorsey was back in the home.

Tara Nunley, a licensed professional counselor, worked with D.D. and J.D. She testified that contact with mother caused the two children to have outbursts, temper tantrums, and exhibit aggressive behaviors. D.D. was placed in Krise-6 for evaluation. After extensive work with the children, they were transitioned into mother's home, but upon their return to mother's home, their behaviors escalated to the point that mother called Nunley for assistance. Nunley stated the children were defiant, disrespectful, and non-responsive toward her when she went to mother's home. Nunley later learned the children had been having contact with Dorsey, which mother had not told Nunley.

The children were returned to foster care after residing with mother for ten days. They were removed from the home because of the contact the children had with Dorsey, the behaviors exhibited by the children, and because mother had not been attending all of her counseling sessions. After the children were returned to foster care, Nunley re-established full intensive services with a team of therapists working with each child for ten hours per week. Nunley stated the behavior of the children "got to the point where they could have put themselves or others in danger." She worked with the children until April 2011 when they were no longer displaying the behaviors that required intensive services. Nunley stated the children were doing "very well" in foster care and it would be detrimental to remove them from their foster home.

The evidence showed mother had two different jobs and three residences since 2009. She was evicted from one residence for non-payment of rent and on one occasion, her landlord was posting an eviction notice when a DSS employee was visiting the home.

Mother testified she did not have a relationship with Dorsey and she had seen him only on one occasion between February 2010 and August 2010. She also stated she had made false charges

against Dorsey and she lied under oath to a magistrate when she told him Dorsey had been staying with her. She also admitted she lied in court regarding a domestic violence charge against Dorsey. When counsel for DSS asked mother whether she was lying then or lying now, mother replied, "That's for you to figure out."

The trial court found DSS provided services to mother allowing her time to correct the situations, obtain additional counseling, and provide stability for the children so they could be returned to her. The court noted that when Dorsey was released from custody, mother's attendance in counseling decreased, and Dorsey had been a "bad influence" on the children, causing negative reactions when they had contact with him. The trial court cited to testimony from counselors that the children had negative behaviors and reactions after being placed back in mother's home. The trial court also stated that mother's credibility was "severely impeached" at the hearing when she admitted she had lied under oath in other courts.

Expressing concern for the best interests of the children, the court noted the children had been in and out of foster care for four years and were doing well in foster care. The children were also performing well in school. The trial court stated it was time for stability and permanency in the lives of D.D. and J.D., and it found mother had not corrected the situation "in a timely manner." The trial court terminated mother's parental rights to both D.D. and J.D., and it ordered a change in goals in the foster care plans to adoption.

Mother appealed the judgment of the trial court to this Court.

Analysis

Mother contends the evidence was insufficient to support the termination of her parental rights because she made substantial progress toward remedying the conditions that brought the children into foster care.

Pursuant to Code § 16.1-283(C)(2), a parent's residual parental rights "of a child placed in foster care . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child" and that

> [t]he parent . . ., without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. . . .

In determining what is in the best interests of a child, this Court has stated

> a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

Clear and convincing evidence proved that termination of mother's parental rights was in the best interests of both D.D. and J.D. At the time of the termination hearing, the two children had been in foster care for the better part of four years. The children were thriving in the care of their foster home which was a potential adoptive placement. They were performing well in school. Mother initially made some progress, particularly when she regularly attended her counseling sessions prior to March 2010. However, she then began to miss her scheduled counseling sessions. DSS employees also reported encounters with Dorsey at mother's home, and there were allegations of domestic violence between mother and Dorsey. Mother was less than forthcoming about her relationship with Dorsey, and she stated she had lied under oath in court concerning abuse allegations she made against him.

- 6 -

Perhaps most importantly, when the children were returned to mother for only ten days, they exhibited negative and aggressive behaviors that their counselor described as being potentially dangerous to themselves and others. The children underwent intensive therapy for more than six months after the trial return to mother's home. In addition, the neuropsychologist opined that a resumption of contact between D.D. and mother had "re-aroused intense underlying emotional conflicts generated by the nature/quality of his relationship" with mother and he suggested it would be in the best interests of the child to have no contact with mother. Moreover, "'past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold.'" Winfield v. Urquhart, 25 Va. App. 688, 695-96, 492 S.E.2d 464, 467 (1997) (quoting Linkous v. Kingery, 10 Va. App. 45, 46, 390 S.E.2d 188, 194 (1990)).

In addition, DSS explored several possible relative placements for the children. However, none were found to be appropriate. Both the JDR court and the trial court dismissed the petitions from great-grandparents of the children.

We recognize that "'[t]he termination of [residual] parental rights is a grave, drastic and irreversible action.'" Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)). However, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The facts and circumstances supported the trial court's findings, by clear and convincing evidence, that termination of mother's parental rights was in the best interests of D.D. and J.D. pursuant to Code § 16.1-283(C)(2).

Accordingly, we affirm the decision terminating mother's parental rights.

<u>Affirmed.</u>