COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Beales and Senior Judge Clements

UNPUBLISHED

HEATHER WITT

MEMORANDUM OPINION[*]

v.      Record No. 0986-12-3                 PER CURIAM
                                            NOVEMBER 20, 2012

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
James V. Lane, Judge

(W. Andrew Harding; Eldridge, Elledge, Evans & Harding, PLC, on
brief), for appellant.  Appellant submitting on brief.

(Kim Van Horn Gutterman, Assistant County Attorney; James O.
Clough, Guardian *ad litem* for the minor children, on brief), for
appellee.  Appellee and Guardian *ad litem* submitting on brief.


Heather Witt, mother, appeals from an order terminating her parental rights to each of her

five minor children and changing the foster care plan goals to adoption.  On appeal of this decision,

mother challenges the sufficiency of the evidence to support the terminations, asserting she

substantially remedied the causes of removal pursuant to Code § 16.1-283(C)(2).  For the reasons

stated below, we affirm the decision of the circuit court.

Mother's parental rights to the five minor children were terminated pursuant to Code

§ 16.1-283(C)(2).  Code § 16.1-283(C)(2) provides that a parent's residual parental rights "of a child

placed in foster care . . . may be terminated if the court finds, based upon clear and convincing

evidence, that it is in the best interests of the child" and that

> [t]he parent . . . , without good cause, ha[s] been unwilling or
> unable within a reasonable period of time not to exceed twelve

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end . . . .

In determining what is in the best interests of a child, this Court has stated

a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

On appeal, we view the evidence in the "'light most favorable' to the prevailing party in the circuit court and grant to that party the benefit of 'all reasonable inferences fairly deducible therefrom.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767 (2005) (quoting Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

In reviewing a trial court's decision terminating parental rights, we presume the trial court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)). The trial court has "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley, 9 Va. App. at 328, 387 S.E.2d at 795. "When based on evidence heard *ore tenus*," the trial court's judgment "will not be disturbed on appeal unless plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988).

Mother argues that while she has not been perfect in the remediation of her issues, she has improved her situation markedly in the majority of areas that were the causes for the removal of the children.

The evidence showed mother's oldest child, C.T., was placed in foster care in March 2002 due to mother's failure to follow through with court-ordered counseling and other services. In addition, mother was habitually unemployed, there were instances of domestic violence in the household, and stable housing was an issue. Mother received a psychological evaluation and was diagnosed with possible bipolar disorder. Custody of C.T was awarded to the father in 2004, but C.T. returned to foster care in July 2010.

In 2003, mother gave birth to C.F. In September 2005, mother was residing with Aaron Shifflett with whom she had a child, C.S. At this time, C.F. was twenty months old and she was adjudicated an abused and neglected child based upon bruising on her face and buttocks. Shifflett admitted he grabbed C.F. by the face and pushed her down onto a bed. C.F. and C.S., who was five months old, were removed from the home, and C.S. was also found to be at risk of abuse and neglect.

The Harrisonburg Rockingham Social Services District (HRSSD) provided in-home services to mother, including family and individual counseling, parenting classes, and drug screening. Mother found employment and housing, and the children's custody was returned to her in June 2006.

In March 2009, Shifflett was convicted of child abuse and neglect related to C.S., who was then three years old. By this time, mother had given birth to two more children with Shifflett, D.S. and R.S. Mother, who no longer resided with Shifflett, would allow the children to spend days with Shifflett, although she told a social worker that Shifflett had substance abuse problems and had been convicted of abusing one of the children. The Harrisonburg-Rockingham Juvenile and Domestic

Relations District Court (JDR court) entered child protective orders ordering that mother and Shifflett not consume alcohol and that Shifflett have no direct contact with the children. However, mother continued to allow Shifflett to have contact with the children, including C.S., in violation of the protective order. Mother and Shifflett remained under the protective orders until the hearing in May 2012.

Meanwhile, mother, who was unemployed, was residing with her boyfriend, David Moats, and her four younger children, C.F., C.S., D.S., and R.S, ages five and younger and she was receiving housing assistance to help her provide a home for her family. During this time, C.S. began to act aggressively and started receiving counseling services.

In September 2009, mother attempted suicide, and the children saw her lying unconscious on the floor as a result of an overdose. Mother was referred to mental health treatment, which she did not complete. When Moats lost his job, the family's income consisted of Moats's unemployment and money received from selling blood plasma. The family also received TANF, food stamps, and services from HRSSD such as bus fare, clothing, payment of some household bills, and assistance to mother to help with her job search.

In January 2010, HRSSD learned of ongoing violence between mother and Moats. The children reported seeing Moats choke their mother, and two of the children reported seeing a gun during the incident. The protective order was amended to require that no guns be present in the home. In June 2010, mother admitted that she used marijuana and that Moats used drugs. In July 2010 mother reported that Moats tried to run over her with his vehicle. Also in July 2010, a few of the children reported that they had seen Moats hit or choke their mother several times. HRSSD employees advised mother it was not wise to continue her relationship with Moats based on the abuse issues and his drug use. Mother responded that she depended on his unemployment income.

During this same time period, HRSSD received reports that the children were unsupervised although mother was not working outside the home. When HRSSD found the three-year-old child at home alone, he smelled of urine and was wearing the same clothes he had worn on the previous day. An employee of HRSSD found two of the children, ages six and three, walking along the street.

Mother told a HRSSD worker she was "stressed out" and there were mornings when she wished she did not wake up. Mother had not followed up with her counseling. HRSSD continued to provide services, clothing, and financial assistance to the family. An employee with HRSSD testified that almost every person in the family needed some type of services, but the situation was deteriorating. The HRSSD employee met with mother numerous times in the summer of 2010 trying to improve the family's circumstances. Finally, on July 21, 2010, the four children were removed from the home and were placed into foster care. Mother stipulated to the fact that her children were neglected. At that time, several of the children were in counseling. One child was receiving speech services, and another child had a behavioral specialist at his school. This was the third time two of the children had been adjudicated to be abused or neglected or at risk of abuse and neglect, and it was their second placement into foster care. C.T., who had been in the custody of her father since 2004, also entered foster care on July 21, 2010.

Nicole Zepp, a foster care social worker, testified that, in order for the children to be returned to mother's care, mother needed to address issues related to substance abuse, stable income, housing, domestic violence, and her mental health. Mother participated in a psychological evaluation which indicated mother had substance abuse issues. Mother sporadically attended substance abuse counseling from May 2011 until August 2011, participating in six of thirteen sessions. She continued to use alcohol despite the protective order ordering her not to consume alcohol.

Although the mental health evaluation recommended treatment for mental health issues, mother failed to complete any such programs. She attended one intake appointment only. The evaluation also indicated mother lacked an understanding of the children's developmental levels, which put the children at high risk of physical neglect and abuse.

From March 2011 to February 2012, family educational services provided services to mother addressing her parenting issues. A licensed clinical social worker testified that, despite the in-home services provided during mother's visits with the children, she did not see many changes in mother's supervisory skills and in following through with rules and structure for the children. In January 2012, mother's visits with the children were moved to the family educational services office based on concerns for mother's supervisory skills and the family dynamics. The social worker testified mother placed much of the blame on her children's behavior as the reason they could no longer visit in the home.

At the time of the circuit court hearing on May 3, 2012, mother was concerned about losing her housing and she had received a letter from the housing authority indicating she had not provided the required documentation. Mother admitted she had a "spotty" employment record prior to the removal of the children in July 2010. She testified she was employed from August 2010 to October 2011 at an automobile detailing business. At the time of the hearing, mother had not been employed for over six months and she was receiving unemployment benefits. In addition, mother continued to have a relationship with Shifflett, who was arrested in 2011 for being drunk in public in an area behind mother's residence.

At the time of the circuit court hearing, the children had been in foster care for almost two years. C.S. was attending an alternative school for children with severe behavioral difficulties, and his behavior had improved. Officials were considering transitioning him into public school. Evidence was presented that C.S. became more aggressive during visits with his mother. However,

his relationship with his foster parents was positive. Several of the children were receiving counseling services. The two youngest children were placed together in a foster home, and their behavioral issues had improved. The foster families were potential adoptive parents, and they expressed a willingness to maintain contact between all the children.

Clear and convincing evidence proved that termination of mother's parental rights was in the best interests of the children because, despite the efforts of HRSSD, mother had been unwilling or unable to remedy substantially the conditions that led to and required the continuation of the children's foster care placement. As recited above, mother's children had been in and out of foster care since 2002. Mother had supervisory issues with the children for years and showed little improvement in that area after they were removed from the home despite the services provided. Mother continued to use alcohol and had not completed recommended substance abuse treatment. In addition, she failed to complete treatment for her mental health issues, which were diagnosed as far back as 2002 and for which she had had numerous referrals for treatment. Mother was unemployed at the time of the hearing and continued to have a relationship with Shifflett despite the fact that he had abused two of her children and also had substance abuse issues. In addition, mother indicated she may be losing her housing. Moreover, the children were improving in foster care.

The children had been in foster care for almost two years at the time of the hearing. We recognize that "'[t]he termination of [residual] parental rights is a grave, drastic and irreversible action.'" Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)). However, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). Furthermore, "'past actions and relationships over a meaningful period serve as

good indicators of what the future may be expected to hold.'" Winfield v. Urquhart, 25 Va. App. 688, 695-96, 492 S.E.2d 464, 467 (1997) (quoting Linkous v. Kingery, 10 Va. App. 45, 46, 390 S.E.2d 188, 194 (1990)).  In addition, decisions to terminate parental rights under Code § 16.1-283(C)

> hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes.  Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he [or she] has been offered rehabilitation services.

Toms, 46 Va. App. at 271, 616 S.E.2d at 772 (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

The evidence showed mother has been unwilling or unable to remedy the conditions which led to or required continuation of the children's foster care placement during the period in which she has been offered considerable rehabilitation services.  Based upon the foregoing, the circuit court did not err in changing the goals of the foster care plans to adoption, in finding termination was in the best interests of the children, and in terminating mother's parental rights pursuant to Code § 16.1-283(C)(2).  Therefore, the circuit court's decision is affirmed.

Affirmed.