COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Kelsey, Beales and Senior Judge Clements


EDWARD BARDE

MEMORANDUM OPINION[*]

v.      Record No. 2084-12-2                              PER CURIAM
                                                          MAY 28, 2013

GOOCHLAND COUNTY DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF GOOCHLAND COUNTY
Timothy K. Sanner, Judge

(Scott D. Cardani; Cardani Law Firm, P.C., on briefs), for appellant.

(Deborah S. Tinsley; Anastasia K. Jones, Guardian *ad litem* for the
minor child, on brief), for appellee.


Edward Barde, father, appeals the termination of his parental rights to his minor child, J.B.,

pursuant to Code § 16.1-283(C)(2).  Father argues the trial court erred in holding the Goochland

County Department of Social Services (DSS) carried its burden of proof that it was in the child's

best interests to terminate father's parental rights and to approve the foster care plan goal of

adoption.  Father also contends the trial court erred in holding DSS complied with its affirmative

duty to investigate all reasonable options for placement of J.B. with a relative.  Upon reviewing the

record and briefs of the parties, we conclude this appeal is without merit.  Accordingly, we

summarily affirm the decision of the trial court.  See Rule 5A:27.

We view the evidence in the light most favorable to the prevailing party below and grant to

it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax Cnty. Dep't of Human

Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

J.B. entered foster care on August 26, 2010 when he was eight years old. He had been in the custody of father since May 2009. From 2007 to 2009, father did not know where J.B. was residing.

Don Wilhelm, a licensed clinical social worker, provided counseling services to J.B. from the time the child entered foster care through the time of the October 24, 2012 trial court hearing. Wilhelm testified that prior to his placement in foster care, J.B. suffered neglect and trauma. J.B. was diagnosed with reactive detachment disorder, and he suffered from complex trauma disorder. He had poor social and communication skills. Wilhelm stated that J.B. made progress in these areas, but would "backslide" when he had visitation with one or both of his parents. Eventually the visitations were terminated and J.B. stabilized. Wilhelm's prognosis for J.B. was "excellent" if he continued the "secure attachment" he had developed with his foster parents.

Kendal Tanaka, a senior social worker at DSS, was also involved with this case since J.B. entered foster care. She stated that before J.B. entered foster care, DSS was concerned about the condition of father's home and father's ability to care for J.B. She testified DSS had provided transportation for father and J.B. for medical appointments and in-home counseling to J.B. Father was receiving food stamps and assistance with utility bills. When J.B. entered foster care, he had severe dental decay, bug bites, and a rash. DSS was concerned about developmental delays with the child. Tanaka also stated that when father moved to Pennsylvania, DSS requested he receive services from the appropriate agency in Pennsylvania.

On November 4, 2010, a dispositional order was entered approving the foster care service plan with the goal of returning to home. The service plan described what was expected of father in order for the child to be returned to his custody. Among other things, father was to obtain a stable living environment, obtain full psychological and substance abuse evaluations and follow all recommended services, address conflict resolution related to his relationship with the child's

mother, provide verification of a valid driver's license or access to public transportation, provide a written plan as to how he would provide for the child's needs, and provide verification of stable income that would sufficiently maintain stable housing and monthly living expenses. Father had lost his driver's license because of unpaid fines.

Approximately six months later, father's case was reviewed. At that time, father had been evicted from his residence and had no stable home. He was moving back and forth between Goochland County and Pennsylvania and had not advised DSS when he moved to Pennsylvania. He had reunited with and separated from the child's mother several times. Father had not complied with any of the requirements set forth in the dispositional plan. DSS scheduled and paid for a psychological evaluation of father by Dr. A.J. Anderson, a clinical psychologist. Father presented no evidence that he had complied with any of the recommendations as outlined in Dr. Anderson's report. In addition, Dr. Anderson's report provided that father had issues "that are likely to prevent him from providing a stable, nurturing parental presence, even with interventions."

On September 22, 2011, a permanency hearing was held. DSS had referred father to a community services board, but his case was closed due to the lack of cooperation by father. DSS was unable to obtain updated information as to whether he had met the counseling requirements. Father had obtained new criminal charges in Pennsylvania related to the child's mother. Father's financial stability remained in question. Provisions were added to the permanency plan requiring father to comply with all recommendations set forth in his psychological evaluation and to incur no further criminal charges. DSS had provided father with Medicaid from December 1, 2009 to October 31, 2010 and declared good cause so father would not be required to pay expenses associated with J.B.'s care and to assist father in improving his financial condition.

As of February 8, 2012, father remained non-complaint with the service plan. On March 20, 2012, DSS filed a new permanency petition and plan seeking a change in goal to adoption. DSS

also filed a petition seeking termination of father's parental rights. In 2011, father had attended only nine out of thirty-four counseling sessions and he was delinquent in his mortgage payments. He owed money for utility bills, and he and the child's mother had legal and financial issues in Pennsylvania. In 2012, DSS was unable to confirm father's residence. Father never provided DSS with verification of any income other than a time period during which he received approximately $210 per month from an agency in Pennsylvania. He missed numerous visitations with J.B., sometimes stating he had no transportation to the scheduled visitations. Father failed to provide DSS with written plans as to how he would meet J.B.'s needs. He failed to provide updated information on his driver's license status.

At the trial court hearing, father testified he sustained injuries from dog bites in January 2010 that for more than two years had rendered him unable to steadily work or to work to his capacity. At the time of the hearing, he was working for himself performing property maintenance and landscaping jobs. He did not work full time, and he did not have health insurance. He resided with a friend at her residence in Pennsylvania. He stated he was attending counseling. He did not have a driver's license, and he owed over $6,000 in fines in two states. Father testified he had attended parenting classes, and he acknowledged he has numerous criminal convictions. Father also testified he was not provided any services or financial assistance from DSS after the child was removed from his custody.

Tanaka testified that in November 2010, DSS provided father with a relative form requesting the names of extended family members who could take custody of J.B. Father failed to return the completed form to DSS. In February 2011, DSS conducted a relative search on its own. DSS communicated with father's sister who asked to not be contacted further. DSS gave father another relative form and again he failed to return it to DSS. In September 2011, father met with DSS and provided the agency with relative information. Tanaka testified DSS sent a total of

- 4 -

seventeen letters to relatives of both father and J.B.'s mother. DSS received three return calls. One relative indicated she wanted to provide J.B. a home, but she would need financial assistance and would have to relocate. This relative had also never met J.B., which was a concern for DSS. Tanaka outlined communications DSS had with another relative, and father's counsel stipulated that she was not a good placement for J.B.

The trial court approved the change in goal of the service plan to adoption and terminated father's parental rights. Father appealed the decision to this Court.

"'In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. at 128, 409 S.E.2d at 463 (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)). The trial court's judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988).

DSS sought termination of father's parental rights based on Code § 16.1-283(C)(2), which states that a court may terminate parental rights if that is in the best interests of the child and

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Decisions to terminate parental rights under Code § 16.1-283(C)

> hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he [or she] has been offered rehabilitation services.

<u>Toms v. Hanover Dep't of Soc. Servs.</u>, 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (citation omitted).

Father asserts that his financial circumstances led to the continuation of the child's foster care placement and DSS did little, if anything, to assist him in regaining financial stability, particularly after the child went into foster care. He also asserts the trial court did not consider all appropriate factors and circumstances concerning what was in the best interest of J.B.

However, father's alleged indigency does not explain why he failed to satisfy any of the threshold paternal duties essential to parenting. In addition, the statute allows the trial court to consider the circumstances both prior to and after foster care placement, including DSS's effort to "rehabilitate the parent . . . prior to the placement of the child in foster care." Code § 16.1-283(C)(2). Before J.B. entered foster care, DSS had provided transportation for father and J.B. for medical appointments and in-home counseling to J.B. Yet, when J.B. entered foster care, he had severe dental decay, bug bites, and a rash. DSS provided father with food stamps and assistance with utility bills. When father moved to Pennsylvania, DSS requested that he receive services from the appropriate agency in Pennsylvania. Furthermore, after J.B. was placed in foster care, DSS referred father to a community services board, but his case was closed due to father's lack of cooperation. DSS provided father with Medicaid for several months after J.B. was removed and DSS declared good cause so father would not be required to pay expenses associated with J.B.'s care and to assist father in improving his financial condition. DSS arranged and paid for father's psychological evaluation with Dr. Anderson.

In addition, the evidence showed that father's financial condition was not the only circumstance that led to J.B.'s removal and his continued stay in foster care. Father committed criminal offenses related to his volatile relationship with J.B.'s mother, he failed to maintain contact

with DSS, he failed to submit a plan as to how he would provide for J.B's needs, he failed to follow recommendations of Dr. Anderson, and he often failed to attend scheduled visitation with J.B.

We recognize that "'[t]he termination of [residual] parental rights is a grave, drastic and irreversible action.'" Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)). However, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). Furthermore, "'past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold.'" Winfield v. Urquhart, 25 Va. App. 688, 695-96, 492 S.E.2d 464, 467 (1997) (quoting Linkous v. Kingery, 10 Va. App. 45, 46, 390 S.E.2d 188, 194 (1990)).

The evidence showed father has been unwilling or unable to remedy the conditions which led to or required continuation of J.B.'s foster care placement during the period in which he has been offered rehabilitation services. Furthermore, J.B. had been in foster care for more than two years at the time of the hearing. There was evidence that the child needed permanency and that father was unable to provide it at any time in the near future. In addition, evidence was presented that the prognosis for J.B. was "excellent" if he continued the "secure attachment" he had developed with his foster parents and J.B. had stated he did not want to return to father's custody. The guardian *ad litem* for J.B. also opined that termination of father's parental rights was in the best interests of J.B. Moreover, Dr. Anderson's report states that father has issues "that are likely to prevent him from providing a stable, nurturing parental presence, even with interventions." Importantly, as the trial court stated, most of father's unresolved circumstances--having little to no income, unstable housing and no driver's license--were "of his own making." Based upon the

foregoing, the trial court did not err in approving the change of the goal of the foster care plan to adoption, in finding termination was in the best interests of J.B., and in terminating father's parental rights pursuant to Code § 16.1-283(C)(2).

Father also alleges the trial court erred in holding that DSS complied with its duty to investigate all reasonable options for the placement of J.B. with relatives. However, father failed to present this argument to the trial court.[1]

"The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998). See Rule 5A:18. Accordingly, Rule 5A:18 bars our consideration of this issue on appeal.

> Although Rule 5A:18 allows exceptions for good cause or to meet the ends of justice, appellant does not argue that we should invoke these exceptions. See e.g., Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail oneself of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." (emphasis added)). We will not consider, *sua sponte*, a "miscarriage of justice" argument under Rule 5A:18.

Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*).

Moreover, even if the issue was preserved, the social worker provided detailed testimony about the attempts by DSS to get relative information from father. She also stated DSS sent seventeen letters to relatives of father and the child's mother and received three responses. Father stipulated one relative was unsuitable, and another relative had never met J.B. and did not have the financial means to support the child. Accordingly, father's argument is without merit.

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

---

[1] The page in the record father references in his opening brief as to where this issue was preserved does not contain this argument.