UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Russell and Malveaux

PAMELA MORELAND

v.       Record No. 1970-15-3

LYNCHBURG DEPARTMENT
  OF SOCIAL SERVICES

CHRISTOPHER MORELAND

v.       Record No. 2000-15-3

LYNCHBURG DEPARTMENT
  OF SOCIAL SERVICES

MEMORANDUM OPINION[*] BY
JUDGE MARY BENNETT MALVEAUX
DECEMBER 27, 2016

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
R. Edwin Burnette, Jr., Judge

(Killis T. Howard, on brief), for appellant Pamela Moreland.
Appellant submitting on brief.

(Yvonne Z. Schewel, on brief), for appellant Christopher Moreland.
Appellant submitting on brief.

(Hope R. Townes; David E. Mass, Guardian *ad litem* for the minor
children, on briefs), for appellee.  Appellee and Guardian *ad litem*
submitting on briefs.


In this consolidated appeal, Christopher Moreland ("father") and Pamela Moreland

("mother") appeal an order terminating their parental rights to their ten children.  Father and mother

contend that the evidence was insufficient to warrant termination of their parental rights under Code

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

§ 16.1-283(B).[1]  For the following reasons, we find the evidence sufficient and affirm the decision below.

## I.  BACKGROUND

When addressing the issue of termination of a parent's parental rights, we view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).  This case involves the termination of father and mother's parental rights to their ten children, C., V., J., D., J.O., Z., E., H., E.L., and P.[2]

### 2005 – April 2012:  Events Leading to Initial Removal

The Moreland family has been involved with the Lynchburg Department of Social Services ("LDSS") since 2005.  In 2005, LDSS was concerned that the children—there were two in the home at that time—were being left in playpens for extended periods and were under-stimulated.  The home was also in an unsanitary condition.  Mother reported being depressed and having anxiety attacks, and there were reports of her potential alcohol abuse.  From July 2005 to March 2006, a service provider worked with mother to improve her parenting skills.  Mother was also provided with mental health counseling.  Later that year, mother flushed her psychotropic medications down the toilet because "they didn't work."  She also told her

---

[1] Father and mother also assign error to the circuit court's finding that the evidence was sufficient to warrant termination of their residual parental rights under Code § 16.1-283(C)(2).  Code § 16.1-283(B) and 16.1-283(C)(2) are "individual bases upon which a petitioner may seek to terminate residual parental rights."  City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 563, 580 S.E.2d 463, 466 (2003).  Upon concluding that termination of parental rights under one subsection of Code § 16.1-283 is warranted, we need not consider whether termination was appropriate under another subsection.  See, e.g, Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005).  Here, because we conclude that the trial court did not err in terminating father and mother's residual parental rights under Code § 16.1-283(B), we do not review its decision to terminate their parental rights under subsection C.

[2] At the time of trial, the oldest child was eleven years old, and the youngest child was two years old.

counselor that she heard voices telling her to "drown the baby." Mother reported feeling overwhelmed with caring for her home and children. Her counselor obtained a temporary detaining order, and mother was hospitalized. She signed a temporary entrustment agreement for her children, and they were placed voluntarily in LDSS custody while she was in the hospital.

In January 2009, LDSS received a report that J.O. had a scalp infection. The scalp infection started in September 2008 and was bleeding by the time J.O. was seen by LDSS the following January. LDSS was concerned that mother had not followed through with medically necessary treatment.

In March 2011, LDSS received a complaint regarding the unsanitary nature of the home. LDSS found that the family's housing conditions were poor and that the children were dirty. Father and mother agreed to clean the home and take steps to get adequate bedding for their children. They had seven children at this time.

In July 2011, LDSS received a complaint regarding C., who had bruising on his forearm consistent with a grab mark. According to the complaint, father grabbed him by the arm, threw him to the ground, and "whooped" him. Father and mother both admitted grabbing C. by the arm. The home was still in poor sanitary condition at this time.

In January 2012, J. was found to have bruising "all over" his body. Father and mother reported that they had been grabbing J. by the arm, and also that C. was "beating" the other children.

Between March 2012 and April 2012, two social workers worked with father and mother to address issues related to housing conditions, hygiene concerns, and parenting and supervision concerns. During a visit on March 15, 2012, they noted that the home was in very poor condition and the children were dirty and without adequate bedding. The children appeared thin and malnourished. The two youngest children, E. and H., were left alone in playpens and were

not receiving adequate stimulation. During their visit, they observed Z., age one at the time, playing on the stairs without supervision; when the social workers alerted father and mother, they did not respond, and Z. subsequently fell down the steps. The social workers returned to the home five days later, on March 20, 2012. E. and H. were in playpens again, and both were staring blankly and were non-responsive to social interaction. Exposed wires were visible in a hole in the wall by E.'s playpen. Father said that E. probably caused the hole by shaking her playpen back and forth. Mother told the social workers that she would not leave the children in the playpens except during nap time.

On April 25, 2012, during the period in which the social workers were assisting father and mother, LDSS received a complaint that J. came to school with several injuries. A forensic nurse concluded that the injuries were not self-inflicted, and some had been caused by direct hits to the face. J.'s teacher reported that at least once a week, J. came to school with what appeared to be a bruise on his arm in the shape of an adult-sized hand. Father stated that he was not aware of any bruises or marks on J., but if he had bruises, it was probably C.'s fault. Mother also denied seeing any bruises or marks on J.

April 2012 – January 2013:  Initial Period in Foster Care

On April 26, 2012, the eight children that father and mother had at the time, C., V., J., D., J.O., Z., E., and H., were removed from the home and placed in foster care. The children were in the custody of LDSS from April 2012 to January 2013. During this period, LDSS provided several services to the parents. Both parents were offered outpatient therapy, parenting instruction, medication management, mental health support, and weekly visitation with their children. They were also provided assistance with transportation and improving the conditions of their home.

Susan Henderson, a licensed professional counselor, provided services to the older children, V., J., D., J.O., Z., and E., when they were placed in foster care in June 2012. When she started working with the children, they manifested anxiety-related behaviors, including restlessness, eating issues, difficulty focusing, difficulty relating to other people, irritability, anger, aggressiveness, and withdrawal from their surroundings. Henderson noted that the children made significant progress toward resolving these behaviors while in their foster homes.

Bridgette Kesler, a case manager with the Early Intervention Infant and Toddler program, worked with the younger children, H., E., E.L., and P., starting in January 2012. Kesler noted that the children thrived in their foster homes, gaining in their development of motor and speech skills.

<u>January 2013 – July 2013: Children Return to Biological Home</u>

The children returned home in January 2013 after the circuit court transferred custody back to their parents. At that time, the court entered a protective order for the children requiring no acts of abuse or neglect by father and mother.

When back in the biological home, the oldest child, C., displayed aggressive behaviors both at school and at home. Additionally, C. had truancy issues. His school also reported that they were concerned about C.'s lack of proper hygiene. C. was violent towards his parents and siblings; V. reported that the children were "all scared of him." Father and mother purchased four airsoft guns for C. while he was back in the biological home. C.'s case manager recommended that he go to a therapeutic day treatment camp during the summer, but the parents failed to sign him up for this camp. Mother stated that she signed him up for another camp, but that C. did not attend. In May 2013, LDSS received a complaint that mother had stopped giving C. his medications for depression and ADHD, without notifying his doctor.

After returning to the biological home, V. had a busted lip, and told an investigator that C. had thrown a toy car at her. V. went to school several times with injuries due to C. throwing items at her. V. also had truancy issues. Henderson, who was only counseling V. at this time, so as not to overwhelm the parents with appointments, noted that after V. returned to the biological home, she became more irritable and withdrawn. Henderson witnessed significant regression in V.'s behavior during the period when she was back in the home with father and mother.

In April 2013, J. was bruised all over his body, as if someone had grabbed him. J. also came to school that month with five red, open sores on his upper back, shoulders, and hand. While back in the biological home, C. shot him with an airsoft gun. In June, 2013, J. experienced auditory and visual hallucinations, and exhibited odd behaviors. Mother was told to give J. some of C.'s medication over the weekend, but she did not follow through with this recommendation.

E. was receiving services during this time period, including speech therapy and developmental education. However, between March 18 and April 24, 2013, four appointments for E. were cancelled by mother.

In January 2013, a service provider saw father play inappropriately with Z. by hitting him with a toy doll.

In February 2013, there was a report that H. was not wearing her glasses and that her vision had regressed. Additionally, H. had lost all of the language skills she had learned in foster care. The service providers working with H. reported that it was very difficult to schedule H.'s "much needed" therapy sessions with mother. H.'s head was misshapen, and she had been referred to a neurosurgeon for treatment. The parents failed to make an appointment with the neurosurgeon. In July 2013, H. was found to have MRSA.

E.L.'s service providers noted that father and mother had been inconsistent with developmental education visits and had canceled numerous scheduled appointments. In July, 2013, during an unannounced visit, a child protective services investigator saw that E.L. had a zip tie in his mouth. The investigator removed it, and one minute later E.L. had a metal pull tab from a soda can in his mouth. Father blamed J.O. for this, saying that he was "always throwing things in the pack and play [sic]." Every time a LDSS employee went to the home, E.L. was in the Pack 'n Play. Father stated that he left E.L. and H. in the Pack 'n Play because he was unable to supervise them with the other children.

In July 2013, P., the youngest child, had severe diaper rash between both of her legs and groin area.

There were no reported incidents with D. or J.O. after they returned to the biological home from foster care. Both children had disabilities. D. had development disabilities, and J.O. had intellectual disabilities and speech impairment.

In May 2013, father reported that he and mother were "mentally and physically stretched" to their limits and that he had observed a mental decline in mother due to stress caused by C.'s behavior.

<u>July 2013 – September 2014: Children Return to Foster Care up to Date of Trial</u>

On July 24, 2013, father and mother were found guilty of civil contempt for violating the circuit court's order of no abuse or neglect. On that date, the eight children previously removed, and the two children born after the April 2012 removal, E.L. and P., were removed from the biological home.

After the children were placed back in foster care, the parents had visitation with their children for one hour a week, except for P., who they saw once a week for two hours. At first,

father and mother saw the nine oldest children together during visitations; however, due to the chaotic nature of these visitations, later visits were broken down into smaller groups.

The service providers working with father and mother noted multiple issues during visitations. Often these concerned safety issues. A social worker had to perform the Heimlich maneuver on D. during one visit, after the parents failed to notice D. choking and then panicked as the choking continued. During one visit, E.L. banged his head on the wall and tried to put his finger in an outlet. Throughout the visits, the children would put items in their mouth and would "stuff[] their faces" with food. The parents did not notice these any of these behaviors.

The service providers also noted issues with father and mother's parenting skills. Mother failed to ensure that H. had her glasses on during visitation, and the glasses are medically necessary to help improve H.'s speech condition. During visitation with the youngest child, P., mother and father did not demonstrate that they knew proper feeding techniques. Some of the children also displayed "rocking" behaviors during visitation, where they would rock violently back and forth or side to side, without father or mother intervening. During one visit, J.O. touched Z. in his penis area; he also straddled D. and tried to kiss her face. Father and mother failed to react to this behavior.

Service providers were also concerned about the children's lack of affection and willingness to visit. The children would not say good bye or "I love you" unless prompted. Several tried to refuse to attend visitation. After visitation was over, the children would run to the elevator and seemed relieved to be leaving.

Father and mother attended every visitation. Don Wilhelm, a clinical social worker, explained at trial that the parents' behaviors during the visits "were essentially appropriate [in] attempting to meet needs," but the visits were "chaotic," and did not meet the children's needs for "secure attachment." During the visits, the children would "vie for attention," and the parents

would "randomly address whatever needs were going on." The parents devoted most of their attention to the youngest child at each visit, and had trouble watching the other children.

After visitation with father and mother, the children would act out in aggressive or self-harming ways. Wilhelm testified that this behavior was normal "because their experience of living with their biological parents is a frightening one . . . children just are profoundly [a]ffected by neglect." Wilhelm did not see any change in the parents' behavior while he observed their visitations. Wilhelm testified that a return to the family home would be "devastating" to the children, because they are in the process of developing secure attachments with their foster families. Additionally, Wilhelm noted that when the parents brought J.E., a new child born in June 2014, to visitation, this acted as a "trigger" for the other children.[3] Wilhelm did testify that the parents seemed to be "doing the best they could" and made "a genuine effort to meet the kids' needs" during visitation.

Dr. Debra Maxey, a licensed family therapist, completed trauma attachment assessments of the children and noted that they displayed "avoidant attachment" with father and mother. In August 2014, Dr. Maxey held a training session for the parents on how to improve their attachment with their children. Dr. Maxey testified that the parents appeared "hopeless" during the training. Father "played on his cell phone" during the session, and at times appeared asleep. Mother had a new baby with her, and paid attention to it without focusing on the training session. There were "no questions and no interaction" from the parents during the session.

In October 2014, LDSS requested that father and mother have six additional months to attempt to incorporate the new attachment techniques they had been taught by Dr. Maxey. In February 2015, when LDSS changed their recommended goal to adoption, there were still

---

[3] Mother gave birth to two more children prior to this matter going to trial. When the parents would introduce a new child, the other children would act out in a variety of ways, including aggressive behavior, excessive masturbation, and severe panic attacks.

significant concerns about the attachment between father and mother and their children. At trial, Dr. Maxey testified that it would take more than two years for father and mother to improve their attachment with their children, and possibly longer, due to the parents' low cognitive ability and inability to accept their role in causing the attachment issues.

Brandi Stinnett, a licensed professional counselor, attended supervised visitation and provided parenting education to father and mother from November 2013 through March 2015. She worked with father and mother for about three or four hours a week during this period. Stinnett provided the parents a specific program for their needs, with an awareness of their lower intellectual abilities. Stinnett testified that consistency was a problem throughout her time with father and mother, as they would initially use a parenting skill they were taught, but later in a similar situation would not re-apply the skill. She tried to incorporate attachment training from Dr. Maxey into her parenting instruction, but was unsuccessful because the parents could not move beyond basic safety training after several months of instruction. Even after working with father and mother for over a year, Stinnett would not have recommended unsupervised visits. Stinnett did testify that mother was a great listener and that while father was often distracted, he also tried to listen and participate.

Service providers testified that the younger children had experienced a variety of developmental delays. They testified that the children's skill levels, which had regressed after the children were returned to their biological home, increased after they were again placed in foster care. In addition, all of the children's service providers recommended that father and mother's parental rights should be terminated and that the children should not return to their biological home.

Dr. Andrew Anderson, a clinical psychologist, conducted assessments of both father and mother. These assessments evaluated the parents' intelligence and parenting ability. Father

received an IQ score of sixty-three, which falls in the mildly intellectually disabled range.[4] Mother received an IQ score of seventy-one, which is at the lower end of the borderline range. Dr. Anderson stated that the parents' intellectual challenges presented them with obstacles in parenting, in that they were more likely to experience stress, less able to respond to education and training, had a more limited ability to reason and solve problems, and were less able to determine a child's needs as they aged.

The assessment of mother provided that she shows "marginal intellectual resources at best" and "significant emotional and behavior problems that are likely to limit her effectiveness in the parent role by limiting her ability to give her children's needs priority over her own desires." While mother demonstrated basically sound values and a commitment to her family, she was also preoccupied with her own feelings and desires and lacked the understanding or judgment to put her children's needs first. Dr. Anderson concluded that mother was unlikely to be able to parent independently a family the size of her own.

The assessment of father provided that he had a strong work ethic, sound values, and a commitment to family. The assessment also showed that father's limited resources and limited stress tolerance would likely undermine his effectiveness as a parent. Dr. Anderson noted that he thought it unlikely that father would ever be capable of parenting independently a family the size of his own.

Testimony at trial established that the children had thrived in their foster care homes, and that their foster families were equipped to handle children with special needs. In February 2015, when LDSS filed the foster care service plan with the recommendation of adoption of all children, the eight oldest children had been in foster care for a total of twenty-nine months, and the two youngest children had been in foster care for a total of twenty months.

---

[4] The cut-off for a determination of permanent and total disability from employment by reason of mental incapacity for social security is sixty-nine.

At trial, father testified that since the children were removed, he had been working on creating a safety plan. He also stated he would take his responsibilities "more seriously now." Mother testified that the children had fun during visitation, but also admitted that she noticed that the children were "a little avoidant" towards her and father.

At trial, four family members, two members of father and mothers' church, and their church pastor testified that father and mother were good and loving parents. Additionally, Christine Ogelsby, a licensed family therapist, testified on behalf of father and mother. Ogelsby began seeing father and mother in March 2015, approximately six months prior to the circuit court trial and testified that she was "very impressed by the progress that they have made." Ogelsby taught father and mother parenting skills, which she testified they were able to implement properly. She did not think their intellectual capacity would prevent them from parenting effectively.

The circuit court, after a three-day trial, entered an order terminating father and mother's residual parental rights pursuant to Code § 16.1-283(B) and (C)(2).

## II. ANALYSIS

"When reviewing a decision to terminate parental rights, we presume the circuit court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). The circuit court has "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990). "Therefore, in a case involving termination of parental rights, '[t]he trial court's judgment, when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to

support it.'"  Eaton v. Wash. Cty. Dep't of Soc. Servs., 66 Va. App. 317, 324, 785 S.E.2d 231, 235 (2016) (alteration in original) (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659).

When considering termination of parental rights, "the paramount consideration of a trial court is the child's best interests."  Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

Pursuant to Code § 16.1-283(B), a court may only terminate parental rights after finding, based upon clear and convincing evidence, that:  (1) the child suffered neglect or abuse; (2) the neglect or abuse presented a serious and substantial threat to the child's life, health or development; and (3) it is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated within a reasonable period of time.

On appeal, father and mother argue that the evidence was insufficient to support the termination of their residual parental rights under Code § 16.1-283(B) because the evidence was not clear and convincing that they caused their children to suffer neglect or abuse.  In addition, they assert that they undertook significant efforts to eliminate any ongoing or future risk to the children.

### Evidence of Neglect or Abuse

Father and mother contend that the evidence was not clear and convincing that they caused their children to suffer neglect or abuse that presented a serious and substantial threat to their life, health, or development.  Father and mother assert that there was "little evidence" that their children were neglected.

However, upon review of the record, it is clear that there was an abundance of evidence that the children suffered neglect.

At the time of trial in September 2015, the family has been involved with LDSS since 2005.  LDSS social workers repeatedly reported that the children appeared thin and malnourished.  They also noted consistent concerns regarding the children's lack of basic

- 13 -

hygiene. At various points throughout their interaction with LDSS, mother and father's home was unsanitary and there was inadequate bedding for their children. These conditions were repeatedly pointed out to mother and father but they failed to remedy them.

Throughout their involvement with LDSS, the children often had serious medical issues, and father and mother failed to follow through with medically necessary treatment. Father and mother repeatedly failed to take them to appointments to address the children's various medical and developmental needs. While back in the biological home, service providers noted that several of the children's developmental skill levels regressed; they increased when the children were returned to foster care. In addition, several children displayed anxiety-related behaviors, which decreased after they entered foster care.

LDSS employees and service providers also observed father and mother failing recognize or correct safety issues that continually occurred in their home. Father and mother also purchased airsoft guns for their oldest child, C., which C. used to inflict injury on the other children. The children would also come to school with bruises, some of which were caused by C., and others of which appeared to have been caused by adult-sized hands.

After a three-day trial, the trial court concluded that the children were neglected and that this neglect presented a serious and substantial threat to their life, health, or development. Here, the evidence, viewed in totality, clearly supports the circuit court's finding.

<u>Effort to Eliminate Ongoing or Future Risk</u>

Father and mother also argue on appeal that they had undertaken significant efforts to eliminate any ongoing or future risk to the children, and sought and accepted help from LDSS, and therefore should not have their parental rights terminated.

LDSS provided father and mother with a variety of services in order to help them effectively parent a family of their size. Father and mother attended every visitation and worked

with LDSS service providers; however, they were unable to make notable progress in their efforts.

The children displayed avoidant attachment with father and mother. Dr. Maxey provided father and mother with training on how to improve their attachment level with their children. Father and mother attended this training session, but failed to pay attention during it. They were later unable to improve their attachment with their children, even after being given an additional six months to implement the strategies they were taught. Further, Dr. Maxey indicated that it would take more than two years for father and mother to improve their attachment with their children due to the parents' low cognitive ability.

The parents were provided with a parenting coach who developed for them a specific program tailored to their needs. Stinnett worked with father and mother from November 2013 through March 2015 for approximately three or four hours a week. Father and mother were inconsistent in using the parenting skills they had been taught. The parenting coach tried to incorporate attachment training, but was unable to do so because father and mother were unable to move beyond basic safety training.

Father and mother had over a year with visitation with their children while they were in foster care. Wilhelm testified that father and mother's behavior did not change during these visits, and the visits remained chaotic and traumatic for the children.

Dr. Anderson testified that it was unlikely that either father or mother would ever be able to parent independently a family the size of their own. Father himself reported that he and mother were "mentally and physically stretched" to their limits and that he had observed a mental decline in mother due to stress.

After working with father and mother for extended periods of time, all of the children's service providers recommended that father and mother's parental rights should be terminated and

that the children should not return to their biological home. While Ogelsby testified that father and mother had made progress in learning parenting skills, she had only worked with them for the six months prior to trial, when father and mother only had two children in their home.

While the evidence established that father and mother loved their children, their behavior over time demonstrated that they could not provide a safe and stable environment for their children. The circuit court specifically noted that father and mother had the opportunity, when their children were initially removed, to improve the care of the family, as they were effectively "put on notice" that they could lose custody of their children. The circuit court found that father and mother were not unwilling, but were unable to effectively improve their parenting skills and remedy safety issues, despite any education and training that could be provided. "[S]ubsection B [of Code § 16.1-283] 'speaks prospectively' and requires the circuit court to make a judgment call on the parent's ability, following a finding of neglect or abuse, to substantially remedy the underlying problems." Toms, 46 Va. App. at 270-71, 616 S.E.2d at 772 (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562, 580 S.E.2d 463, 466 (2003)). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003) (quoting In re Jasmon O., 787 P.2d 1297, 1310 (Cal. 1994)). "[P]ast actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Linkous v. Kingery, 10 Va. App. 45, 56, 390 S.E.2d 188, 194 (1990) (quoting Frye v. Spotte, 4 Va. App. 530, 536, 359 S.E.2d 315, 319 (1987)). As demonstrated by father and mother's past behavior, the evidence here supported the circuit court's finding that the parents did not and could not substantially remedy the underlying problems. Therefore, we reject father and mother's argument that their parental rights should not be terminated due to their efforts in complying with services provided by LDSS.

Further, "[t]he [termination] statute clearly contemplates that efforts to resolve the 'conditions' relevant to termination are constrained by time." Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax Cty. Dep't of Soc. Serv., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). Here, when LDSS filed the foster care service plan with the recommendation of adoption of all children, the eight oldest children had been in foster care for a total of twenty-nine months, and the two youngest children had been in foster care for twenty months. Service providers indicated that it was unclear that father and mother could ever learn the skills necessary to parent their family and that even if they were able to obtain these skills, it would be a lengthy process.

Viewed in the light most favorable to LDSS, clear and convincing evidence proved that the children suffered neglect that "presented a serious and substantial threat to [their lives], health or development," Code § 16.1-283(B)(1), and "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the [children's] safe return to [their] parent or parents within a reasonable period of time," Code § 16.1-283(B)(2). Therefore, the record supports the circuit court's decision to terminate father and mother's parental rights under Code § 16.1-283(B).

## III. CONCLUSION

For the foregoing reasons, we conclude the circuit court did not err in terminating the parental rights of both parents. Accordingly, the decision of the trial court is affirmed.

Affirmed.